IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

No. 94-5138
_____

District Court No. 94-2183-CV

CUBAN AMERICAN BAR ASSOCIATION, INC.,
CUBAN LEGAL ALLIANCE, INC.,
DUE PROCESS, INC., LIZBET MARTINEZ,
ARIANNA GONZALEZ NOBAEZ,
ARNIEL DEL CAMPO GANZALEZ, on behalf of
  themselves and all others similarly
  situated, JOVANI MIGUEL FEFFE PINO,
NESTOR RODRIGUEZ LABORI,
NELSON TORRES PULIDO, MARITZA EXPOSITO,
DAVID BUZZI, ALBERTO RODRIGUEZ GARCIA,
  on behalf of themselves and all others
  similarly situated,
LEYDIS MILAGROS RUIZ MENDEZ, on behalf of
  herself and all others similarly situated,
ELENA PINO, VIRGINIA PEREZ, on behalf of
  themselves and all others similarly situated,

Plaintiffs-Appellees,

HAITIAN REFUGEE CENTER, INC.; GARRY JOSEPH,
PAULOMME EDMOND, PIERRE ONEL ANTOINE,
VOIDIEU JEAN LOUIS, BERGELINE JEAN LOUIS,
PADECI JEAN LOUIS, on behalf of themselves
  and others similarly situated,

Provisional Intervenors,

versus

WARREN CHRISTOPHER, Secretary of State,
WILLIAM J. PERRY, Secretary of Defense,
DORIS MEISSNER, Commissioner, Immigration
  and Naturalization Service,
JANET RENO, Attorney General,
IMMIGRATION AND NATURALIZATION SERVICE,
BRIGADIER GENERAL MICHAEL WILLIAMS,
  Commander Joint Task Force,

Defendants-Appellants.

District Court No. 94-2183-CV

CUBAN AMERICAN BAR ASSOCIATION, INC.,
CUBAN LEGAL ALLIANCE, INC.,
DUE PROCESS, INC., LIZBET MARTINEZ,
ARRIANNA GONZALEZ NOBAEZ,
ARNIEL DEL CAMPO GONZALEZ, on behalf of
  themselves and all others similarly
  situated, JOVANI MIGUEL FEFFE PINO,
NESTOR RODRIGUEZ LABORI,
NELSON TORRES PULIDO, MARITZA EXPOSITO,
DAVID BUZZI, ALBERTO RODRIGUEZ GARCIA,
  on behalf of themselves and all others
  similarly situated,
LEYDIS MILAGROS RUIZ MENDEZ, on behalf of
  herself and all others similarly situated,
ELENA PINO, VIRGINIA PEREZ, on behalf of
  themselves and all others similarly situated,

                                        Plaintiffs,

HAITIAN REFUGEE CENTER, INC.; GARRY JOSEPH,
PAULOMME EDMOND, PIERRE ONEL ANTOINE,
VOIDIEU JEAN LOUIS, BERGELINE JEAN LOUIS,
PADECI JEAN LOUIS, on behalf of themselves
  and others similarly situated,

                             Provisional Intervenors-
                                        Appellees,

                    versus

WARREN CHRISTOPHER, Secretary of State,
WILLIAM J. PERRY, Secretary of Defense,
DORIS MEISSNER, Commissioner, Immigration
  and Naturalization Service,
JANET RENO, Attorney General,
IMMIGRATION AND NATURALIZATION SERVICE,
BRIGADIER GENERAL MICHAEL WILLIAMS,
  Commander Joint Task Force,

                             Defendants-Appellants.

_____

Appeals from the United States District Court
     for the Southern District of Florida
_____

**(January 18, 1995)**

Before KRAVITCH, BIRCH and CARNES, Circuit Judges.

**BIRCH, Circuit Judge:**

This case requires us to address the following issues: (1) whether Cuban and Haitian migrants temporarily provided safe haven at the United States' naval base at Guantanamo Bay, Cuba, and at the United States' military installations in Panama, may assert rights under the Immigration and Nationality Act, the 1951 United Nations Convention Relating to the Status of Refugees, the Cuban Adjustment Act, the Cuban Democracy Act and the Constitution of the United States; (2) whether legal organizations can sustain First Amendment claims of freedom of speech and association with these migrants; and (3) whether the First Amendment or the Equal Protection clause of the Fifth Amendment dictates that the United States government must furnish a list of Haitian migrants who are residing at Guantanamo Bay to the Haitian Refugee Center, a legal service organization. The district court has entered preliminary injunctions granting attorneys for the Cuban migrants access to all Cuban migrants provided safe haven prior to voluntary repatriation and attorneys for Haitian migrants access to their clients and any other Haitian migrants who request counsel in writing, barring the government from repatriating any Cuban migrants prior to the migrant's consultation with a lawyer, directing the United States Attorney General to parole unaccompanied minor Haitian migrants into the United States on the same terms that unaccompanied minor Cuban migrants have been or may be paroled, and requiring the

government to release the names of all Haitian migrants to the Haitian Refugee Center.  After thorough review of authority in this circuit and the Supreme Court, we VACATE the district court's order and REMAND to the district court with direction to dismiss the plaintiffs' claims.

## I.  BACKGROUND

### A.  Factual Background

### 1.  Cuban Migration

On August 8, 1994, Fidel Castro, announced that the Cuban government would no longer forcibly prevent emigration from Cuba by boat.  Castro's new policy encouraged thousands of Cubans to board makeshift rafts and boats to escape Cuba and head for the shores of the United States.  While many were lost at sea, approximately 8000 Cubans arrived in the United States safely.

In an effort to quell this influx of migrants and to save the rafters' lives, on August 19, 1994, the President of the United States ordered the United States Coast Guard to intercept watercraft carrying persons fleeing from Cuba and bound for the United States' border and to transport these persons to the American naval base at Guantanamo Bay, Cuba.  The United States leases its military base at Guantanamo Bay from sovereign Cuba under a lease agreement negotiated in 1903.[1]

---

[1]The Agreement for the Lease to the United States of Lands in Cuba for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, art. III, T.S. No. 418, reprinted in, 6 Bevans 1113-15 [hereinafter Lease Agreement], provides that the United States has "control and jurisdiction" over the leased land, but that Cuba retains sovereignty over

In August, 1994, the United States government began negotiating with the Cuban government to halt the flow of migrants to the United States. These diplomatic negotiations culminated on September 9, 1994, in an accord with the Cuban government. In this accord, the United States agreed it would only allow Cuban migrants to enter the United States by applying for immigrant visas or refugee admittance at the United States Interests Section in Havana, Cuba. A minimum of 20,000 persons are to be allowed to migrate legally to the United States each year, not including immediate relatives of United States citizens who are under no numerical restrictions. However, in conjunction with this international agreement, the Attorney General also ordered that no Cuban who had accepted safe haven in Guantanamo Bay or Panama would be allowed to apply for a visa or for asylum in the United States from safe haven.[2]

Currently, Cuban migrants have three options with respect to their residence: (1) they may remain in safe haven, (2) they may repatriate to

the land. The lease states in pertinent part:

> While on the one hand the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the [leased] areas of land and water, on the other hand the Republic of Cuba consents that during the period of the occupation by the United States of said areas under the terms of this agreement the United States shall exercise complete jurisdiction and control over and within said areas . . . .

Lease Agreement, art. III.

[2]According to Michael Skol, Principal Deputy Assistant Secretary of State for Inter-American Affairs at the Department of State, this policy was implemented "to deter further dangerous migration from Cuba, and to provide Cubans seeking entry into the United States a safe alternative to boat departures . . . ." Skol Decl. ¶ 9.

sovereign Cuba voluntarily; or (3) they may travel to a third country willing to accept them. While more than 1000 Cubans have requested voluntarily to be returned to Cuba, the Cuban government has restricted the return of Cuban nationals and has delayed the voluntary repatriation process. Persons who repatriate to Cuba voluntarily may then apply for asylum through the regular channels commencing at the United States Special Interests Section in Havana, Cuba.

The United States government's expressed desire is not to maintain these migrants for an indefinite period of time or against their will. The government's position is that it could return the migrants to Cuba legally without a migrant's request. However, the government has offered the Cuban migrants safe haven for as long as the migrants wished. All Cuban migrants volunteering to repatriate execute a form approved by the United Nations High Commissioner for Refugees ("UNHCR") and meet with a representative from UNHCR before returning.

UNHCR is an agency of the United Nations specializing in the care and well-being of refugees worldwide. UNHCR was established by the United Nations general assembly on January 1, 1951, "to provide international protection to refugees and to seek permanent solutions for their problems." UNHCR, Handbook for Emergencies § 2.2(1) (1982). The UNHCR "aim[s] . . . to secure treatment in accordance with universally recognized humanitarian principles not directly linked to the status [as refugees] of

6

those in need." Id. § 2.1(4); see also id. § 2.2(1).  UNHCR has participated with the United States government in ensuring that any return to Cuba was made on a voluntary basis.

In addition to UNHCR, humanitarian groups such as Amnesty International, Inc., the U.S. Committee for Refugees, and Church World Service (Immigration and Refugee Service) as well as legal organizations such as the Ad Hoc group of Cuban-American Attorneys, have been allowed to visit the migrants at the base.  However, as the numbers of migrants and the length of the stay in safe haven have increased, problems have erupted. Many Cuban migrants have climbed over barbed wire and jumped from treacherous cliffs into the bay in attempts to swim the mile or so back to sovereign Cuba.  Still others have scaled fences and braved a mine field in order to reach their homeland.  During early December, 1994, many were injured during riots at the camps, particularly in Panama.  The risk of violence and danger, both to the migrants and the military personnel charged with their care, has grown.  While the United States has begun negotiating with other countries to accept migrants from the safe haven and has continued with the voluntary repatriation program, problems continue.

Since consummation of the accord, the Attorney General has exercised her discretion to parole into the United States Cuban migrants who have sponsors in the United States and are (1) over the age of 70; (2) who are ill; or (3) who are unaccompanied minors (under the age of 13).

She has also begun to consider, on a case-by-case basis, the possible parole of other Cuban children at Guantanamo Bay who are accompanied, but who may suffer severe hardship if they remain in safe haven. Over 20,000 Cubans currently remain in safe haven at Guantanamo Bay[3] and at military installations in Panama.

## 2. Haitian migration

In 1991, Haiti's elected leader, Jean-Bertrand Aristide, was ousted from power. As a result, thousands of Haitians departed Haiti and attempted to reach the United States. Between May, 1992, and June, 1994, the United States Coast Guard interdicted on the high seas Haitians bound for the United States and returned them directly to Haiti. In June, 1994, the government began processing some migrants for asylum in the United States. However, in July, 1994, the United States began offering safe haven at Guantanamo Bay to the migrant Haitians; the government was not allowing the Haitian migrants to enter the United States, but was not returning them directly to Haiti. At the peak of emigration in 1994, over 16,800 Haitian migrants were housed at Guantanamo Bay simultaneously.[4]

---

[3]The base at Guantanamo Bay is divided up into various camps housing families, single men, single women and unaccompanied children. There are two special camps, Camps November I and II, where migrants who have voluntarily requested to be repatriated are housed for their safety.

[4]Haitian migrants are only being housed at Guantanamo Bay; no Haitians are in safe haven in Panama. The camp divisions are similar to those maintained for Cuban migrants; however, there are no special camps for those migrants who have requested repatriation.

On September 19, 1994, the United States led a United Nations-authorized military intervention in Haiti. Through these efforts, Haitian President Jean-Bertrand Aristide was returned to power on October 15, 1994. After his reinstallation, an ever-increasing number of Haitians in safe haven have volunteered to repatriate. Approximately 8000 Haitians remained at Guantanamo Bay on December 19, 1994.

B. Procedural Background

1. The Cuban Migrants' Case

On October 23, 1994, plaintiffs-appellees, Cuban American Bar Association, Inc., Cuban Legal Alliance, Inc., and Due Process, Inc. (collectively "Cuban Legal Organizations"), some Cuban individuals being held on Guantanamo Bay, and some individuals with family members being held on Guantanamo Bay (collectively "individual Cuban plaintiffs") filed a class action complaint requesting declaratory and injunctive relief under, inter alia, the First and Fifth Amendments, 8 U.S.C. § 1253(h), 8 U.S.C. § 1158(a), and Article 33 of the 1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, [hereinafter the Refugee Convention][5]. Specifically, the Cuban Legal Organizations and the

---

[5]The United States acceded to the United Nation Protocol Relating to the Status of Refugees on November 6, 1968. The Protocol bound the United States to comply with Articles 2 through 34 of the Refugee Convention. Protocol Relating to the Status of Refugees, opened for accession, Jan. 31, 1967, art. I, § 1, 19 U.S.T. 6223. The United States agreed to the Protocol with the following reservation, "[a]s to any such provision, the United States will accord to refugees lawfully staying in its territory treatment no less favorable than is accorded aliens generally in the same circumstances." 19 U.S.T. at 6257.

individual Cuban plaintiffs requested that the district court enter an injunction preventing the defendants-appellants ("the government") from denying the Cuban Legal Organizations reasonable access to and communication with their Guantanamo Bay clients for legal consultation relative to the Cuban migrants' putative rights regarding asylum petitions and parole decisions, and an injunction prohibiting the government from "encouraging or coercing, directly or indirectly, the repatriation to Cuba of, and repatriating, any [Cuban migrant] currently being detained by the United States Government."  Class Action Compl. at 59, Cuban Am. Bar Ass'n v. Christopher, No. 94-2183 (S.D. Fla. Oct. 24, 1994) [hereinafter CABA I].

On October 25, 1994, upon learning that at 11:30 a.m. that day the government would  return to Cuba, by plane, twenty-three Cuban migrants who had previously volunteered for repatriation, the Cuban Legal Organizations and the individual Cuban plaintiffs filed an emergency motion for a temporary restraining order and request for an emergency hearing to block the repatriation.  Approximately one minute before the plane was to take off, the district court verbally ordered the government to halt the repatriation of these migrants.

The district court further considered the arguments of the parties, and on October 31, 1994, the court granted the Cuban Legal Organizations' and the individual Cuban plaintiffs' motion for an emergency "temporary

restraining order." Order Granting Plaintiffs' Emergency Mot. for T.R.O., CABA I, (Oct. 31, 1994) [hereinafter October 31 Order]. The district court specifically granted the Cuban Legal Organizations and the individual Cuban plaintiffs the following relief:

> (a) [The government] shall refrain from denying [Cuban Legal Organizations] and other counsel reasonable and meaningful access to the [Cuban migrants in safe haven]; and
> (b) [The government] shall refrain from repatriating any [Cuban migrants in safe haven], including those twenty-three (23) persons who were the subject of the temporary restraining Order entered October 25, 1994, without permitting them access to counsel and receipt of full information so as to assure an informed and voluntary decision to seek repatriation.

Id. at 13 (emphasis added). The October 31 Order was put into effect "until further order of the court." Id.

On November 1, 1994, the government filed a notice of appeal and a motion requesting the district court to stay its own order. The district court failed to grant this request and the government, on November 2, 1994, pursuant to 28 U.S.C. § 1292(a)(1), filed a motion for summary reversal, or in the alternative, for an emergency stay pending appeal in this court. On November 3, 1994, we granted that request in part, staying that portion of the district court's October 31 Order which prevented repatriation of Cuban migrants who had requested in writing to be returned. Cuban Am. Bar Ass'n v. Christopher, No. 94-5138 (11th Cir. Nov. 3, 1994) [hereinafter CABA II] [hereinafter November 3 Order]. On November 4, 1994, we heard oral argument on an expedited basis and that day modified our November 3

Order verbally. We entered a written order on November 7, 1994, confirming our verbal order.  CABA II, (Nov. 7, 1994) [hereinafter November 7 Order]. We granted the government's motion in part and denied it in part. Specifically, we instructed the government to allow the Cuban Legal Organizations reasonable access to their clients and any other Cuban migrants who, in writing, requested legal counsel.  We also stayed that portion of the district court's order that prevented the government from arranging repatriation of Cuban migrants in Camp November, who "expressed a desire, by written declaration, to be returned to sovereign Cuba"; however, we barred the government from repatriating any Cuban migrant who did not "express, by written declaration, a desire to be returned to sovereign Cuba."  November 7 Order at 2.  After our November 7 Order but prior to oral argument over 241 Cubans were repatriated.

2.  The Haitian Migrants' Case

On October 31, 1994, the Haitian Refugee Center ("HRC") and some individual Haitian migrants at Guantanamo Bay filed a motion to intervene and a motion for temporary restraining order.  HRC requested a temporary restraining order instructing the government to afford HRC access to all Haitian migrants at Guantanamo Bay, barring the government from denying parole to unaccompanied Haitian minors, and ordering the disclosure of the identities of all Haitian migrants in safe haven.

The district court issued two orders granting in part the relief HRC requested in its original motion for a temporary restraining order.[6]   The district court issued its preliminary order on November 22, 1994, granting HRC access to named plaintiffs and any other Haitian migrants who requested counsel in writing, ordering the Attorney General to parole from safe haven unaccompanied Haitian minors in the same manner as unaccompanied Cuban minors, and directing the government to release the names of all Haitian migrants to HRC.  Order on Provisional Intervenors' Mot. for T.R.O., <u>CABA I</u>, (Nov. 22, 1994) [hereinafter November 22 Order]. Upon the government's motion, the district court granted a stay of the November 22 Order as it applied to parole of the minor Haitians and the release of the names of migrants, but continued in force the order allowing

---

[6]Prior to the district court's ruling on the original motion for a temporary restraining order, on November 1, 1994, the district court heard an oral motion by HRC for a temporary restraining order blocking the government from repatriating fourteen Haitians at Guantanamo Bay who were scheduled for imminent repatriation.  The government agreed to delay repatriation until November 3, 1994. The government was planning to repatriate a total of fifty-four Haitians; forty of those were returning to seek medical attention and the remaining fourteen were the subject of the district court's order.  The day after oral argument, November 2, 1994, the district court provisionally granted the HRC's motion to intervene and entered a temporary restraining order preventing the government's scheduled repatriation of the fourteen Haitians.  Corrected Order on Mot. to Intervene and Mot. for T.R.O., <u>CABA I</u>, (Nov. 2, 1994).

HRC then requested that the district court bar the government from repatriating Haitians who were scheduled to return to Haiti on November 20, 1994. On November 18, the district court ordered that repatriation could occur as planned under the condition that all Haitians repatriated had requested repatriation in writing. Order on Haitian Refugee Ctr.'s Emergency Mot. for T.R.O. and Request for Emergency Hr'g, <u>CABA I</u>, (Nov. 18, 1994).  That repatriation took place as scheduled.

HRC access to detained Haitians who requested legal counsel. Omnibus Order, <u>CABA I</u>, (Nov. 28, 1994) [hereinafter November 28 Order].

Appeals from these orders were filed and on December 1, 1994, the cases filed by the Cuban Legal Organizations and the individual Cuban plaintiffs (No. 94-5138) and HRC and the individual Haitian migrants (Nos. 94-5231 and 94-5234) were consolidated for consideration by this court. On December 19, 1994, after oral argument on the issues presented, we dissolved our November 7 Order and stayed all the relief granted by the district court in its October 31 Order, November 22 Order and November 28 Order. Furthermore, by our December 19 Order, we stayed all further proceedings in the district court, including discovery.

3. <u>Issues on Appeal</u>

We now consider the following issues on appeal:

1. Whether the Cuban or Haitian migrants in safe haven outside the physical borders of the United States have any cognizable statutory or constitutional rights.

2. Whether the Cuban Legal Organizations or HRC have a First Amendment right to associate with migrants held in safe haven outside the physical borders of the United States for the purposes of engaging in political speech and if so, whether the government engages in impermissible viewpoint discrimination violative of any First Amendment rights of the individual

14

migrants or the Cuban Legal Organizations or HRC by restricting the legal organizations' access to the migrants for the purposes of legal consultation.

3. Whether the government must disclose to HRC the names of all Haitian migrants in safe haven.

## II. DISCUSSION

### A. Jurisdiction

### 1. Appealability of Temporary Restraining Orders

While temporary restraining orders are not generally subject to appellate review, Haitian Refugee Ctr., Inc. v. Baker, 950 F.2d 685, 686 (11th Cir. 1991) [hereinafter "HRC I"]; McDougald v. Jenson, 786 F.2d 1465, 1472 (11th Cir.), cert. denied, 479 U.S. 860, 107 S. Ct. 207, 93 L. Ed. 2d 137 (1986), "where the order has the effect of a preliminary injunction this court has jurisdiction to review the order and is not bound by the district court's designation of the order." HRC I, 950 F.2d at 686. To determine whether an order denominated as a temporary restraining order is actually a preliminary injunction, we review the duration of the order; "whether it was issued after notice and a hearing"; the extent of evidence submitted to the district court; and the continuing safeguards installed by the district court. McDougald, 786 F.2d at 1472. After review of the district court's orders, we conclude that they are in fact appealable preliminary injunctions. See November 3 Order. With respect to the district court's October 31 Order,

the court explicitly referred to the order as "preliminary injunctive relief." October 31 Order at 4. Moreover, the order is of indefinite duration; it was issued after notice and a hearing; the court received evidence and considered declarations from both parties (commenting that no further factual development need be made before ruling); and the court required the parties to report jointly to it every thirty days regarding the status under its order. We conclude that the characteristics of this October 31 Order belie the district court's label as a temporary restraining order; it is in all respects an appealable preliminary injunction.[7] Thus, pursuant to 28 U.S.C. § 1292(a)(1), we have jurisdiction over an appeal from that order.

With respect to the district court's November 22 Order and November 28 Order granting HRC and the individual Haitian parties relief, but staying portions of that relief during appeal, the district court specifically stated that "pursuant to 28 U.S.C. § 1292(b), the court finds that this Order involves controlling questions of law regarding the rights of [migrants] in Guantanamo Bay which are subject to a difference of opinion and that an immediate appeal may advance the ultimate termination of this case."

---

[7]In Sampson v. Murray, 415 U.S. 61, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974), the Supreme Court observed:

A district court, if it were able to shield its orders from appellate review merely by designating them as temporary restraining orders, rather than as preliminary injunctions, would have virtually unlimited authority over the parties in an injunctive proceeding. In this case, where an adversary hearing has been held, and the court's basis for issuing the order strongly challenged, classification of the potentially unlimited order as a temporary restraining order seems particularly unjustified.

Id. at 86-87, 94 S. Ct. at 951. Such is the case here.

November 22 Order at 2. On December 1, 1994, we exercised our discretion and permitted appeal from these orders, and accordingly, we take jurisdiction of this appeal under 28 U.S.C. § 1292(b).

## 2. Standing

In its appeal to this court for emergency relief from the district court's October 31 order, the government raised a question regarding the standing of the Cuban Legal Organizations and the individual Cuban plaintiffs relative to the putative injuries to parties not before the court, specifically all those migrants who expressed a written desire to be repatriated. Appellants' Mot. for Summ. Reversal, or, in the Alternative for An Emergency Stay Pending Appeal (or a Writ of Mandamus), CABA II, at 22 n.65 (filed Nov. 2, 1994). These migrants were prevented from returning to Cuba by the district court's oral order on October 25, 1994, and by the October 31 Order. After our November 7 Order, repatriation of those who had expressed in writing a desire to return to sovereign Cuba was continued as arranged with the Cuban government. Appellant's Brief at 6 n.2. But for our stay, the remaining Cuban migrants in Camp November who had requested to be returned to Cuba would be affected by the district court's order barring their repatriation.

The principle of standing is "derive[d] from the Article III limits on the jurisdiction of federal courts." Jackson v. Okaloosa County, 21 F.3d 1531, 1536 (11th Cir. 1994).

17

> Before rendering a decision . . . every federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based; and this obligation on the court to examine its own jurisdiction continues at each stage of the proceedings, even if no party raises the jurisdictional issue and both parties are prepared to concede it.

Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 759 (11th Cir. 1991). We recognize two components to the standing doctrine: the minimum constitutional requirements of Article III and the prudential considerations of judicial self-government. Harris v. Evans, 20 F.3d 1118, 1121 (11th Cir.) (en banc), cert. denied, ___ U.S. ____, 115 S. Ct. 641, ___ L. Ed. 2d ____ (1994); F.D.I.C. v. Morley, 867 F.2d 1381, 1386 (11th Cir.), cert. denied, 493 U.S. 819, 110 S. Ct. 75, 107 L. Ed. 2d 41 (1989). To meet the irreducible minimum constitutional requirements, the plaintiff must show "(1) that he has suffered an actual or threatened injury, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed by a favorable ruling." Harris, 20 F.3d at 1121; accord Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S. Ct. 752, 758, 70 L. Ed. 2d 700 (1982); Jackson, 21 F.3d at 1537; Morley, 867 F.2d at 1386. The party must also show that prudential considerations do not weigh against consideration of the claims. Harris, 20 F.3d at 1121; Morley, 867 F.2d at 1386. We have identified three particular situations in which we will decline to address a party's claim for prudential

reasons: "(1) assertion of a third party's [putative] rights rather than individual legal rights; (2) allegation of a generalized grievance rather than an injury peculiar to such litigant; or (3) assertion of an injury outside the statute's or constitutional provision's zone of interests." Morley, 867 F.2d at 1386.

For each claim stated in a complaint, there must be a plaintiff who will achieve some redress by the court's actions. Jackson, 21 F.3d at 1536. As of this interlocutory appeal, the classes sought have not been certified; neither the Cuban Legal Organizations nor the individual Cuban plaintiffs represent the approximate 1000 Cuban residents of Camp November who expressed their desire in writing to be returned to sovereign Cuba as soon as possible. "Inclusion of class action allegations in a complaint does not relieve a plaintiff of himself meeting the requirements for constitutional standing, even if the persons described in the class definition would have standing themselves to sue." Brown v. Sibley, 650 F.2d 760, 771 (5th Cir. Unit A July 1981); accord Church v. City of Huntsville, 30 F.3d 1332, 1340 (11th Cir. 1994) ("[U]nless . . . one of the named plaintiffs is in real and immediate danger of being personally injured . . . the plaintiff class lacks standing . . . ."); Jones v. Firestone Tire and Rubber Co., 977 F.2d 527, 531 (11th Cir. 1992) (holding that a party may only represent a class to "the extent that he has standing to bring individual claims"), cert. denied, ___ U.S. ____, 113 S. Ct. 2932, 124 L. Ed. 2d 682 (1993). We conclude that the

plaintiffs in this case are not suffering any real or threatened injury by the repatriation of any migrant who has expressed, in writing, his or her desire to be returned to sovereign Cuba. None of the individual Cuban plaintiffs claims to have requested repatriation and are therefore, outside the group who is being affected directly by the district court's October 31 Order barring repatriation without prior consultation with a lawyer. However, the individual Cuban migrants may properly challenge the United States' repatriation policies to the extent that they allege that they may suffer imminent injury by being coerced in the future into signing declarations of desire to repatriate or being wrongly repatriated to sovereign Cuba, whether or not they may succeed on the merits of those claims. See Morley, 867 F.2d at 1387 (holding that standing is determined without considering the party's likelihood of ultimately succeeding on the merits of their claims).

B. Standard of Review

"Ordinarily, the grant of a preliminary injunction is reviewed for abuse of discretion; however, if the trial court misapplies the law we will review and correct the error without deference to that court's determination." Haitian Refugee Ctr., Inc. v. Baker, 949 F.2d 1109, 1110 (11th Cir. 1991) (per curiam) [hereinafter "Baker"], cert. denied, ___ U.S. ____, 112 S. Ct. 1245, 117 L. Ed. 2d 477 (1992). As discussed below, the district court misapplied the law governing the issues presented in this case. Thus, we accord no

deference to the district court's determinations in granting the preliminary injunctions in this case.

## C. The Merits

A preliminary injunction is extraordinary relief. Church, 30 F.3d at 1342. Because of the nature of a preliminary injunction, before relief can be granted, the party requesting the injunction must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) its own injury outweighs the injury to the nonmovant; and (4) the injunction would not disserve the public interest." Baker, 949 F.2d at 1110 (emphasis added); accord Church, 30 F.3d at 1342. The district court misapplied the law in this case; thus, we accord no deference to the court's decision.[8] Under the precedent of this circuit and the Supreme Court,[9] we

---

[8]Despite controlling precedent in this circuit, the district court relied upon Haitian Ctrs. Council, Inc. v. Sale, 823 F.Supp. 1028 (E.D.N.Y. 1993) vacated by Stipulated Order Approving Class Action Settlement Agreement (Feb. 22, 1994) [hereinafter HCC], to support its grant of the preliminary injunction as to the Cuban migrants. Whatever may be the effect in the Eastern District of New York of this now vacated district court decision in HCC, it has no precedential value in this circuit. Much of the reasoning in that decision is contrary to binding precedent in this circuit.

[9]We are bound by precedent established by this court, by the Fifth Circuit prior to October 1, 1981, and by the Supreme Court of the United States. See C.G. Willis, Inc. v. Director, Office of Workers' Compensation Programs, 31 F.3d 1112, 1115 n.8 (11th Cir. 1994) ("Only the en banc court or the Supreme Court may overrule the settled law of this circuit."); Bonner v. City of Prichard, 661 F.2d 1206, 1209, 1210 (11th Cir. 1981) (en banc) (adopting the decisions of the Fifth Circuit handed down on or before September 30, 1981, as precedent in the Eleventh Circuit, reasoning that "[s]tability and predictability are essential factors in the proper operation of the rule of law."). We recognize no other legally binding precedent. While other circuit and district courts may have considered similar issues, it is the case law of this circuit which governs our decisions. Specifically, Haitian Refugee Ctr., Inc. v. Baker, 953 F.2d 1498 (11th Cir.) (per curiam), cert. denied, ___ U.S. ____, 112 S. Ct. 1245, 117 L. Ed. 2d 477 (1992) [hereinafter HRCII], Jean v. Nelson, 727 F.2d 957 (11th Cir. 1984) (en banc) [hereinafter Jean I], aff'd on other grounds, 472 U.S. 846, 105 S. Ct. 2992, 86 L. Ed. 2d 664 (1985) [hereinafter Jean II], and the Supreme Court's

conclude that the Cuban Legal Organizations, HRC, the individual Cuban plaintiffs and the individual Haitian migrants cannot meet the first prerequisite to the grant of a preliminary injunction, a showing of "substantial likelihood of success on the merits [of their claims]," and thus, are not entitled to injunctive relief. See Church, 30 F.3d at 1342.

## 1. Statutory and Constitutional Rights of Migrants in Safe Haven

The Cuban migrants and the Haitian migrants are asserting statutory rights under the Immigration and Naturalization Act, 8 U.S.C. §§ 1101-1503 ("INA") and the Refugee Convention. The individual Cuban plaintiffs in safe haven also assert rights under the Cuban Refugee Adjustment Act, 8 U.S.C. § 1255, and the Cuban Democracy Act, 22 U.S.C. §§ 6001-6010. The individual Haitian unaccompanied minor plaintiffs assert rights against discriminatory parole decisions under 8 U.S.C. § 1182. Additionally, the individual Cuban plaintiffs advance claims to Fifth Amendment rights of due process and the individual Haitian migrants are asserting Fifth Amendment rights to due process and equal protection of the laws.

### a. Status of Guantanamo Bay

The district court in this case relied upon Haitian Ctrs. Council, Inc. v. Sale, 823 F. Supp. 1028 (E.D.N.Y. 1993), vacated by Stipulated Order Approving Class Action Settlement Agreement (Feb. 22, 1994) [hereinafter HCC], in entering its order granting the Cuban migrants meetings with

decision in Sale v. Haitian Ctrs. Council, Inc., ___ U.S. ____, 113 S. Ct. 2549, 125 L. Ed. 2d 128 (1993), guide and bind us here.

22

lawyers upon request and barring repatriation of migrants without prior legal consultation.  In the HCC case, the New York district court found that lawyers had a First Amendment right to free speech and association for engaging in legal consultation[10] at Guantanamo Bay because it was a naval base over which the United States has "complete control and jurisdiction" and "where the government exercises complete control over all means of delivering communication."  Id. at 1040.  The district court here erred in concluding that Guantanamo Bay was a "United States territory."  October 31 Order at 9.  We disagree that "control and jurisdiction" is equivalent to sovereignty.  See Agreement for the Lease to the United States of Lands in Cuba for Coaling and Naval Stations, Feb. 26, 1903, U.S.-Cuba, T.S. No. 418 (distinguishing between sovereignty of the Republic of Cuba over the leased land and the "control and jurisdiction" granted the United States), reprinted in 6 Bevans 1113-15; cf. United States v. Spelar, 338 U.S. 217, 221-22, 70 S. Ct. 10, 12, 94 L. Ed. 3 (1949) (construing the Federal Tort Claims Act not to apply to an American military air base in Newfoundland because the lease between Newfoundland and the United States "effected no transfer of sovereignty with respect to the military bases concerned").

The Cuban Legal Organizations and HRC attempt to circumvent precedent in this circuit by arguing that Haitian Refugee Ctr., Inc. v. Baker,

---

[10]The Eastern District of New York declined to decide whether the migrants at Guantanamo Bay themselves had any First Amendment rights.  HCC, 823 F. Supp. at 1041.

**953 F.2d 1498 (11th Cir.) (per curiam),** <u>cert. denied</u>, **112 S. Ct. 1245 (1992)** [hereinafter "<u>HRC II</u>"], in contrast with the instant case, dealt solely with Haitians who were interdicted on the high seas and returned to Haiti by United States Coast Guard cutters. However, we also addressed the claims of Haitians who were interdicted on the high seas and then transported to Guantanamo Bay. <u>See</u> <u>HRC II</u>, 953 F.2d at 1514; <u>id.</u> at 1516-17 (Hatchett, J., dissenting). Based upon our holding in <u>HRC II</u>, 953 F.2d at 1510, we again reject the argument that our leased military bases abroad which continue under the sovereignty of foreign nations, hostile or friendly, are "functional[ly] equivalent" to being land borders or ports of entry of the United States or otherwise within the United States.[11] Therefore, any statutory or constitutional claim made by the individual Cuban plaintiffs and the individual Haitian migrants must be based upon an extraterritorial application of that statute or constitutional provision.

> **b.** **<u>Extraterritorial Application of Legislation and the Constitution</u>**

---

[11]Panama regained sovereignty over the Panama Canal Zone and the area where the United States maintains military installations by the Panama Canal Treaty of 1977. Panama Canal Treaty, Sept. 7, 1977, U.S.-Pan., art. III, § 1, art. IV, § 2, 33 U.S.T. 39; Panama Canal Treaty, Implementation of Article IV, Sept. 7, 1977, U.S.-Pan., art. I, annex A, 33 U.S.T. 307.

If the migrants have been provided rights by statute,[12] we need not reach the constitutional questions urged upon us. However, because the Cuban Legal Organizations and HRC struggle to re-assert statutory claims foreclosed by HRC II and Sale v. Haitian Ctrs. Council, Inc., ___ U.S. ____, 113 S. Ct. 2549, 125 L. Ed. 2d 128 (1993), and fail to assert new meritorious statutory claims, we reach the constitutional issues as well.

We decided in HRC II, 953 F. 2d at 1510, and the Supreme Court agreed in Sale, 113 S. Ct. at 2557-58, 2563, that the very same statutes and treaties regarding repatriation, Article 33 of the Refugee Convention,[13] and

---

[12]Domestic legislation is not presumed to apply extraterritorially absent express Congressional authorization. See Sale, 113 S. Ct. at 2561, 2562, 2567 ("Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested. That presumption has special force when we are construing treaty and statutory provisions that may involve foreign and military affairs for which the President has responsibility.").

[13]Article 33 of the Refugee Convention states in pertinent part that "[n]o Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality . . . or political opinion." Refugee Convention, supra, art. 33, 19 U.S.T. at 6276. We have held that this article is not self-executing, but must be given force by enactment of domestic legislation. Baker, 949 F.2d at 1110.

the INA, specifically, 8 U.S.C. § 1253(h)[14] and 8 U.S.C. § 1158(a)[15] do not apply extraterritorially.  In HRC II, we unequivocally held that the interdicted Haitians could not claim any rights under sections 1253(h) or 1158(a).  We further concluded that:

> the interdicted Haitians [on Coast Guard cutters and at Guantanamo Bay] have none of the substantive rights -- under . . . the 1967 United Nations Protocol Relating to the Status of Refugees, the Immigration and Naturalization Service Guidelines, the Refugee Act of 1980, the Immigration and Nationality Act, or international law -- that they claim for themselves or that the HRC claims for them.

HRC II, 953 F.2d at 1513 n.8 (emphasis added).  These laws, which govern repatriation of refugees, bind the government only when the refugees are at or within the borders of the United States.  See id. at 1509-10.  Therefore,

---

[14]Section 1253(h)(1), the domestic legislation implementing Article 33, provides that "[t]he Attorney General shall not deport or return any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality . . . or political opinion." Nothing in this statute extends its application "beyond the borders of the United States."  HRC II, 953 F.2d at 1509-10.

The individual Cuban plaintiffs also assert rights under 8 U.S.C. §§ 1101(a)(42), 1157(c), 1182, 1225, 1226, and 1362; however, because these provisions merely supplement rather than address the questions presented to us, we consider their claims as being made under § 1253(h) and § 1158(a).

[15]Section 1158(a) provides that:
>  The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

§ 1158(a).  We have found that the "clear meaning of this language" is that persons interdicted before reaching the United States cannot base a right to asylum or asylum processing on this provision.  HRC II, 953 F.2d at 1510.

the claims asserted by the migrants under the INA and under Article 33 continue to be untenable.

The individual Cuban plaintiffs attempt to utilize the Cuban Refugee Adjustment Act, 8 U.S.C. § 1255, and the Cuban Democracy Act, 22 U.S.C. §§ 6001-6010, to assert the right of the Cuban migrants to seek parole and asylum in the United States. While these acts acknowledge the political climate in Cuba, provide for economic sanctions for dealing with Cuba, and allow for certain rights for Cubans who reach the United States, they do not address the rights of Cuban migrants to enter or to seek entry to the United States initially, nor do they confer directly any rights upon the Cuban migrants outside the United States. Hence, neither of these acts can be relied upon by the individual Cuban plaintiffs to assert a right against repatriation or to seek parole or asylum in the United States from safe haven.

### Right to Counsel

The individual Cuban plaintiffs and the individual Haitian migrants claim a due process right to obtain and communicate with legal counsel of their choice regarding asylum application or parole in order to protect an interest against being wrongly repatriated from safe haven. In order for the migrants to have a right to counsel, they must first have a protectable liberty or property interest. See Board of Regents v. Roth, 408 U.S. 564, 569-572, 92 S. Ct. 2701, 2705-06, 33 L. Ed. 2d 548 (1972). The Executive

Branch has made the policy decision not to offer preliminary refugee determination interviews, or "screening"[16] to the Cuban or Haitian migrants. In previous Haitian migrant cases, migrants who have been held to have a liberty interest to which due process could attach had been "screened-in" by the government. See HCC, 823 F. Supp. at 1042; Haitians Ctrs. Council, Inc. v. McNary, 969 F.2d 1326, 1345 (2d Cir. 1992), vacated as moot sub nom. Sale v. Haitians Centers Council, Inc., ___ U.S. ____, 113 S. Ct. 3028, 125 L. Ed. 2d 716 (1993). In this case we need not decide whether any such putative liberty interest arises from being "screened-in." As discussed below, no such procedure was undertaken.

The individual Cuban and Haitian plaintiffs have argued that the processing which occurs when the migrants are brought into safe haven is similar to the screening procedure which takes place when the government attempts to discern if a migrant is a refugee. However, providing safe haven residency is a gratuitous humanitarian act which does not in any way create even the putative liberty interest in securing asylum processing that the Second Circuit found that initial screening creates. See McNary, 969 F.2d at 1345 ("By these humanitarian actions alone [(rescuing the migrants

_____

[16]"Screening" is a preliminary process during which a determination may be made that the migrant has a well-founded fear of persecution if repatriated. See Haitian Ctrs. Council, Inc. v. McNary, 969 F.2d 1326, 1345 (2d Cir. 1992), vacated as moot sub nom. Sale v. Haitian Ctrs. Council, Inc., ___ U.S. ____, 113 S. Ct. 3028, 125 L. Ed. 2d 716 (1993). If the migrant is preliminarily ascertained to have a well-founded fear of persecution if repatriated, the migrant is "screened-in." See id. If after an interview, the determination is made that the migrant does not have such a fear, then the migrant is "screened-out" and repatriated.

from the sea and bringing them to Guantanamo Bay)], it does not appear that the legal status of the aliens was altered. However, once the interdicted persons have been 'screened in' the appellants[] . . . can fairly be said to have established a reasonable expectation in the 'screened in' plaintiffs in not being wrongly repatriated . . . ."). We also note that the district court mistakenly relied upon the HCC case, because that case addressed only the plight of Haitian migrants who had been "screened in" as possible refugees. HCC, 823 F. Supp. at 1041 ("Here, the Haitian Service Organizations have been retained by the Screened In Plaintiffs and have asserted a right to speak with their clients, the screened-in Haitians." (emphasis added)). The migrants in this case have not been "screened in" or otherwise processed for asylum. By bringing the migrants to safe haven, the government has not created any protectable liberty or property interest against being wrongly repatriated and the migrants may not rest a claim of right of counsel and information on the due process clause.

## Unaccompanied Minor Haitians' Right to Parole

The individual unaccompanied minor Haitian migrants are asserting statutory and constitutional equal protection claims to be paroled into the United States on the same basis that unaccompanied minor Cubans have been or may be paroled into the United States.[17] The unaccompanied minor

---

[17]"Parole is an act of extraordinary sovereign generosity, since it grants temporary admission into our society to an alien who has no legal right to enter . . . ." Jean I, 727 F.2d at 972.

**Haitian migrants claim that the Attorney General has abused her discretion under the INA, 8 U.S.C. § 1182,[18] by paroling in Cuban unaccompanied minors but not Haitian unaccompanied minors. While this claim is not dependent upon the extraterritorial application of the statute, it fails nonetheless. We agree with our <u>en banc</u> court's statement in <u>Jean v. Nelson</u>, 727 F.2d 957, 981-82 (11th Cir. 1984) (en banc) [hereinafter "<u>Jean I</u>"], <u>aff'd on other grounds</u>, 472 U.S. 846, 105 S. Ct. 2992, 86 L. Ed. 2d 664 (1985) [hereinafter "<u>Jean II</u>"], that "there is little question that the Executive has the power to draw distinctions among aliens based on nationality." <u>Jean I</u>, 727 F.2d at 978 n.30; <u>see generally</u>, Exec. Order No. 12,711, 55 Fed. Reg. 13,897 (1990), <u>reprinted in</u> 8 U.S.C. § 1157. This authority extends both to the President of the United States and the Attorney General.[19] <u>Jean I</u>, 727 F.2d at 978. Aliens may be excluded or denied parole on grounds that might be "suspect in the context of domestic legislation," because "there are**

---

[18]Section 1182(d)(5)(A) provides in part:
    The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission into the United States . . . .
§ 1182(d)(5)(A).

[19]We note, however, that in the Supreme Court's affirmance of <u>Jean I</u>, its holding was limited to whether "'low-level . . . government officials [may] act in such a manner which is contrary to federal statutes . . . and the directions of the President and the Attorney General, both of whom provided for a policy of non-discriminatory enforcement.'" <u>Jean II</u>, 472 U.S. at 853, 105 S. Ct. at 2996 (first omission added)(quoting Brief for Pet'rs at 37). While we held in <u>Jean I</u> that lower-level Immigration and Naturalization Service officials could not disregard the orders of their superiors, here we are faced with the extensive authority of the Attorney General and the President to make distinctions on the basis of citizenship and the political climate of the alien's homeland.

apparently no limitations on the power of the federal government to determine what classes of aliens will be permitted to enter the United States or what procedures will be used to determine their admissibility." Id. at 965 n.5. Here, the Attorney General has exercised her discretion on the legitimate basis of the very different political climates in Haiti, under the newly restored democratic President Jean-Bertrand Aristide on the one hand, and in Cuba, under the regime of Fidel Castro on the other. See Garcia-Mir v. Smith, 766 F.2d 1478, 1492 (11th Cir. 1985) (per curiam) (holding Attorney General need only assert a "'facially legitimate and bona fide'" reason for a parole decision (quoting Jean I, 727 F.2d at 977)), cert. denied, 475 U.S. 1022, 106 S. Ct. 1213, 89 L. Ed. 2d 325 (1986). Thus, we hold that the statutory claims made by the unaccompanied minor Haitian migrants are without merit and cannot justify an injunction directing the government to parole them into the United States. Because we conclude that the statute alleged does not protect the unaccompanied Haitian minors, we address their constitutional equal protection claim.

In Jean I, we held that unadmitted and excludable aliens "cannot claim equal protection rights under the Fifth Amendment, even with regard to challenging the Executive's exercise of its parole discretion." 727 F.2d at 970 (emphasis added).[20] The plaintiffs in Jean I could not "challenge the

_____

[20]Although the Supreme Court held that we should not have reached the constitutional issue in that case because "the current statutes and regulations provide petitioners with nondiscriminatory parole consideration -- which is all they seek to obtain by virtue of their constitutional argument," Jean II, 472 U.S. at 854-55,

31

decisions of executive officials with regard to their applications for admission, asylum, or parole, on the basis of the rights guaranteed by the United States Constitution," id. at 984, because they had "no constitutional rights with regard to their applications," id. at 968; accord Landon v. Plasencia, 459 U.S. 21, 32, 103 S. Ct. 321, 329, 74 L. Ed. 2d 21 (1982) ("[T]he power to admit or exclude aliens is a sovereign prerogative."); cf. Perez-Perez v. Hanberry, 781 F.2d 1477, 1479 (11th Cir. 1986) ("The world is not entitled to enter the United States as a matter of right."). The individual unaccompanied Haitian migrants here, who are outside the borders of the United States, can have no greater rights than aliens in Jean I who were physically present in the United States. See Landon, 459 U.S. at 32, 103 S. Ct. at 329 ("[H]owever, once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.").

In HRCII, we concluded that the interdicted Haitians on Coast Guard cutters and at Guantanamo Bay did not possess any of the statutory rights they claimed under the INA and the Refugee Convention, or the constitutional rights they claimed under the due process clause of the Fifth Amendment, and the First Amendment. HRC II, 953 F.2d at 1503, 1511 n.6

---

105 S. Ct. at 2997, our en banc holding in that case regarding the constitutional issue remains viable as the Supreme Court did not vacate the opinion but affirmed and remanded on alternative grounds. See also Perez-Perez v. Hanberry, 781 F.2d 1477, 1479 (11th Cir. 1986) (dictum); Garcia-Mir v. Smith, 766 F.2d 1478, 1484 (11th Cir. 1985) (per curiam) (dictum); Jean v. Nelson, 863 F.2d 759, 770 (11th Cir. 1988) (dictum), aff'd, 496 U.S. 154, 110 S. Ct. 2316, 110 L. Ed. 2d 134 (1990).

(agreeing with the district court that the Haitian migrants had no "correlative First Amendment rights of their own"). Our decision that the Cuban and Haitian migrants have no First Amendment or Fifth Amendment rights which they can assert is supported by the Supreme Court's decisions declining to apply extraterritorially either the Fourth Amendment, United States v. Verdugo-Urquidez, 494 U.S. 259, 274-75, 110 S. Ct. 1056, 1066, 108 L. Ed. 2d 222 (1990) (rejecting Fourth Amendment limits to search and seizure of property owned by a non-resident alien conducted in Mexico by United States agents), or the Fifth Amendment, Johnson v. Eisentrager, 339 U.S. 763, 784, 70 S. Ct. 936, 947, 94 L. Ed. 1255 (1950) (rejecting claim that aliens outside the sovereign territory of the United States are entitled to Fifth Amendment rights). Cf. Reid v. Covert, 354 U.S. 1, 77 S. Ct. 1222, 1 L. Ed. 2d 1148 (1957) (plurality opinion) (holding the right to a jury trial applies to an American citizen abroad being tried by a United States military court (narrowest holding)). Clearly, aliens, outside the United States, cannot claim rights to enter or be paroled into the United States based on the Constitution.

Therefore, any right to equal protection of the laws, due process, or rights under the INA or the Refugee Convention now asserted by the Haitian and Cuban migrants are not cognizable. Thus, neither group of migrants could have a "substantial likelihood of success on the merits" which is a

33

necessary predicate to the grant of injunctive relief. The district court erred in granting relief to the individual Cuban and Haitian migrants.

## 2. First Amendment Rights of the Cuban Legal Organizations and HRC

Both the Cuban Legal Organizations and HRC claim a First Amendment right to freedom of association with the migrants and free speech such that the government must provide the lawyers access to clients and any other migrants who request counsel. In HRC II, we held that the two primary First Amendment cases recognizing a First Amendment right for a lawyer to solicit a client for the purpose of engaging in litigation as a form of political expression, NAACP v. Button, 371 U.S. 415, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963), and In re Primus, 436 U.S. 412, 98 S. Ct. 1893, 56 L. Ed. 2d 417 (1978), "recognize a narrow First Amendment right to associate for the purpose of engaging in litigation as a form of political expression." HRC II, 953 F.2d at 1513 (emphasis added). However, we concluded that "[t]his right is predicated upon the existence of an underlying legal claim that may be asserted by the potential litigant . . . ." Id. (emphasis added).[21]

---

[21]Button and In re Primus "do not recognize a right of access to persons properly in government custody," HRC II, 953 F.2d at 1512, which is what the Cuban Legal Organizations and HRC have requested. The lawyers' claims under the First Amendment do not require that the government assist it in communicating with clients or potential clients in safe haven. Id. at 1513. Although the attorneys argue that they require no financial assistance or transportation from the government, for the lawyers to meet with their clients, assistance is necessarily required in providing access to the base, meeting areas, accommodations and security.

Neither the Cuban nor the Haitian migrants have any of the statutory or constitutional rights claimed here which might sustain the attorneys' claims to right of association, and "associational freedom in no way implies a right to compel the Government to provide access to those with whom one wishes to associate." Id. Hence, it would not only be improper, but also "nonsensical," for us to hold today that attorneys for either migrant group suddenly possess "a right of access to the interdicted [migrants] for the purpose of advising them of their legal rights." Id.

Because under precedent of this circuit, neither the migrants nor the lawyers may assert First Amendment rights of association and speech in this context, we need not determine whether the government engaged in any viewpoint-based discrimination in denying the Cuban Legal Organizations and HRC access while granting humanitarian organizations access. Providing humanitarian organizations access to the migrants does not, without more, create a First Amendment right to that access for those humanitarian organizations or for the Cuban Legal Organizations and HRC. If the First Amendment does not apply to the migrants or to the lawyers at Guantanamo Bay, the government cannot be engaging in impermissible viewpoint-based discrimination by restricting association between the migrants and counsel. Cf. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U. S. 37, 44, 46, 103 S. Ct. 948, 954, 955, 74 L. Ed. 2d 794 (1983) (holding first that the First Amendment applied to teachers' mailboxes in a

public school, but that the "'First Amendment does not guarantee access to property simply because it is owned or controlled by the government,'" and that there was no First Amendment right to access to the mailboxes (quoting <u>United States Postal Serv. v. Council of Greenburgh Civic Ass'ns</u>, 453 U.S. 114, 129, 101 S. Ct. 2676, 2684, 69 L. Ed. 2d 517 (1981))).[22]  For the above reasons, an injunction requiring the government to provide reasonable and meaningful access of legal counsel to the migrants in the safe haven, based on First Amendment rights of the attorneys is not justified.

## 3.  <u>Disclosure of Haitian Migrants' Identities</u>

HRC contends that the government's refusal to disclose the identities of Haitian migrants at Guantanamo Bay violates HRC's First Amendment

---

[22]We recognize that the <u>HCC</u> court found that "First Amendment [is] applicable to U.S. conduct on a military base."  823 F.Supp. at 1040. The court cited <u>Flower v. United States</u>, 407 U.S. 197, 198-99, 92 S. Ct. 1842, 1843-44, 32 L. Ed. 2d 653 (1972) (per curiam) for this proposition.  From our reading of <u>Flower</u> we find it is clearly distinguishable.  The military base in question in <u>Flower</u> was Fort Sam Houston in San Antonio, Texas; not Guantanamo Bay or an installation in Panama. There, a civilian (an American citizen) was arrested for distributing leaflets on an road within the fort.  The Supreme Court found that the road was essentially a public one as there was "no sentry post or guard at either entrance or anywhere along the route," <u>Flower</u>, 407 U.S. at 198, 92 S. Ct. at 1843 (quoting <u>United States v. Flower</u>, 452 F.2d 80, 90 (5th Cir. 1972) (Simpson, J. dissenting)), and more than 15,000 cars travelled through the fort each day via this road.  These are facts not remotely analogous to the access policies at Guantanamo Bay, Cuba, or presumably at the installations in Panama.  Moreover, the Supreme Court has recognized the limited nature of its holding in <u>Flower</u>.  <u>See</u> <u>Greer v. Spock</u>, 424 U.S. 828, 835, 96 S. Ct. 1211, 1216, 47 L. Ed. 2d 505 (1976); <u>U.S. v. Albertini</u>, 472 U.S. 675, 684-86, 105 S. Ct. 2897, 2904-05, 86 L. Ed. 2d 536 (1985); <u>see also</u> <u>M.N.C. of Hinesville, Inc. v. U.S. Dept. of Defense</u>, 791 F.2d 1466, 1473 n.3 (11th Cir. 1986).  Hence, we are of the opinion that this case does not stand for the proposition that the First Amendment necessarily applies at American military bases located in foreign countries.

rights to freedom of association and violates the Haitian migrants' rights to equal protection of the laws and rights under the INA and international law. The district court, without stating its reasons, ordered that the government provide HRC a list of all Haitian migrants in safe haven. As decided above, the Haitian migrants in safe haven cannot claim the rights and privileges of the statutes enumerated or of the Constitution with respect to a right to counsel, their repatriation or parole into the United States. Thus, they cannot succeed on any claim that they have rights which are being violated by failure to disclose their identities to HRC. What remains then is a request by HRC that the government release information. Such a claim is typically made under the Freedom of Information Act; however, no claim has been made under the Act here. Instead, this claim is constitutional in nature. The Supreme Court has held that there is "no discernible basis for a constitutional duty [on the government] to disclose, or for standards governing disclosure of or access to information." Houchins v. KQED, Inc., 438 U.S. 1, 14, 98 S. Ct. 2588, 2596, 57 L. Ed. 2d 553 (1978) (plurality opinion). "This Court has never intimated a First Amendment guarantee of access to all sources of information within government control." Id. at 9, 98 S. Ct. at 2593-94. Because there is no authority for us to compel disclosure of the Haitian migrants' identities, we cannot force the government to provide HRC with access to the list of Haitian migrants in safe haven. See id.

37

## III. CONCLUSION

While we have determined that these migrants are without legal rights that are cognizable in the courts of the United States, we observe that they are nonetheless beneficiaries of the American tradition of humanitarian concern and conduct. In the context of the refugees' world of today (e.g., Bosnia and Rwanda) this is significant. While these migrants are faced with difficult conditions, the demonstrated concern of groups like the Cuban Legal Organizations and HRC and the goodwill of their military rescuers and caretakers will hopefully sustain and reassure them in their quest for a better life.

Nevertheless, we cannot contravene the law of this circuit and of the Supreme Court of the United States in order to frame a legal answer to what is traditionally and properly a problem to be addressed by the legislative and executive branches of our government. See Perez-Perez, 781 F.2d at 1479. "Although the human crisis is compelling, there is no solution to be found in a judicial remedy." Sale, 113 S. Ct. at 2567 (quoting Haitian Refugee Ctr. v. Gracey, 809 F.2d 794, 841 (D.C. Cir. 1987) (Edwards, J., concurring)). For the foregoing reasons, the preliminary injunctions issued by the district court and dated October 31, 1994, November 22, 1994, and November 28, 1994, together with our December 19 Order, are hereby DISSOLVED and these cases are REMANDED to the district court with direction to dismiss the plaintiffs' claims.