PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 95-8230
_____

D. C. Docket No. 1:94-CV-1298-ODE


WALKER L. CHANDLER; SHARON T. HARRIS; JAMES
D. WALKER,

                                        Plaintiffs-Appellants,

        versus


ZELL D. MILLER, Governor; MAX CLELAND,
Secretary of State of Georgia; JAMES G.
LEDBETTER, Commissioner Department of Human
Resources State of Georgia,

                                        Defendants-Appellees.


_____

        Appeal from the United States District Court
          for the Northern District of Georgia
_____

                **(January 22, 1996)**


Before EDMONDSON, DUBINA and BARKETT, Circuit Judges.


**EDMONDSON, Circuit Judge:**

        This case requires us to determine the constitutionality of
a Georgia statute requiring drug testing of political candidates
and nominees for state offices.  We hold that Georgia's rule

violates no federal constitutional provision and affirm the district court's judgment.

## I.

In 1990, the Georgia legislature enacted O.C.G.A. § 21-2-140.[1] The offices to which the statute applies include, among others, those of the Governor, Lieutenant Governor, Secretary of State, Attorney General, the heads of several agencies, all state judges in courts of general jurisdiction, and all state legislators. Id. § 21-2-140(a)(4). Plaintiff-appellants are members of the Libertarian Party seeking the offices of Lieutenant Governor, Commissioner of Agriculture, and member of the House of Representatives.

As the language quoted in the margin indicates, anyone who declines to take the test, or who tests positive, is basically barred from holding office. Additional aspects of the drug-testing scheme were outlined by the district court: testing may, at the option of the candidate, be performed either at an approved medical testing laboratory or at the office of the candidate's physician.

---

[1]O.C.G.A. § 21-2-140 provides:

At the time a candidate for state office qualifies for nomination or election, each such candidate shall file a certificate . . . stating that such candidate has been tested for illegal drugs . . . and that the results of such test are negative. . . . No candidate shall be allowed to qualify for nomination or election to a state office unless he or she presents such certificate . . . .

Laboratory procedures concerning privacy follow the Mandatory Guidelines for Federal Workplace Drug Testing Programs, set out at 53 Fed. Reg. 11,979 (1988). The test is designed to reveal the presence or absence of the indicia of five illegal drugs. No information unrelated to drug use is contemplated by the statute; the test simply indicates that the candidate tested positive or negative.

The appellants' arguments comprise three identifiable claims.[2] First, appellants argue the tests violate the Fourth Amendment prohibition on unreasonable searches and seizures. Second, appellants categorize the statute as affecting the Fourteenth Amendment rights of candidates to run and of voters to choose them. Third, they categorize their refusal to submit to the test as a protected speech act that cannot, under the First Amendment, be the basis for barring a candidate from the ballot.

II.

That the tests at issue are searches within the meaning of the Fourth Amendment seems settled. See <u>Skinner v. Railway Labor</u>

_____

[2]Appellants' brief refers to almost every right enumerated in the Constitution. Many of these textual provisions are touched on only in passing, with no citations of authority. The district court focused exclusively on appellants' Fourth Amendment claim, and Appellants asserted at argument here that they chiefly advanced their First and Fourteenth Amendment claims. We regard all federal constitutional arguments except these (First, Fourth, and Fourteenth Amendments) as either abandoned or without merit.

Executives Ass'n, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989).  Like the test at issue in National Treasury Employees Union v. Von Raab , 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), this test "is not designed to serve the ordinary needs of law enforcement."  489 U.S. at 666; 109 S.Ct. at 1391.  That is, the test is not designed to prosecute crime:  no party before us contends otherwise.  Special needs are involved.  In this circumstance, the courts must "balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."  489 U.S. at 665-66, 109 S.Ct. at 1390-91.  Another federal appeals court considering suspicionless drug testing has noted that "Von Raab's balancing test is inherently, and doubtless intentionally, imprecise.  The Court did not purport to list all of the factors that should be weighed or to identify which factors should be considered more weighty than others."  Willner v. Thornburgh, 928 F.2d 1185, 1187 (D.C. Cir. 1991).

No federal court seems to have entertained a Fourth Amendment challenge to a state law requiring testing of candidates for high state office.  Thus we observe at the outset the special concerns affecting the Von Raab balancing test where the state's interest is in setting qualifications for its own officers.

American history is especially important in a case like this one; and the Supreme Court observed nearly a century ago:

> It is obviously essential to the independence of the States, and to their peace and tranquility, that their

4

> power to prescribe the qualifications of their own officers . . . should be exclusive and free from external interference, except so far as plainly provided by the Constitution of the United States.

Taylor v. Beckham, 178 U.S. 548, 570-71, 20 S.Ct. 890, 898, 44 L.Ed.2d 1187 (1900); (cited in Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991)). In the light of this command, we regard the states as entitled to considerable deference in the characterization of their own interests.

Under the Skinner-Von Raab framework, the state's interest is calculated mainly by reference to two factors: the level of documented evidence of a past problem and the fundamental inconsistency of drug use with the demands of the position. In Skinner, the Court approved suspicionless drug testing where there was a documented showing of widespread substance abuse among employees in the position to be subjected to testing. 489 U.S. at 607, 109 S.Ct. at 1407-08.

In Von Raab, the Customs office did not demonstrate a past of drug abuse among the employees to be tested. The Court approved the search anyway, however, when confronted with evidence that physical and ethical demands on customs agents were so great as to render drug use totally incompatible with the nature of the position. 489 U.S. at 669-70, 109 S.Ct. at 1393. Thus, because Georgia has not argued that her elected officials have in the past abused drugs, the issue on Georgia's interest is whether unlawful drug use is similarly fundamentally incompatible with high state office.

We think that to ask this question is also to answer it. The

5

people of Georgia place in the trust of their elected officials that which people value most highly: their liberty, their safety, their economic well-being, ultimate responsibility for law enforcement, and so on. The Supreme Court has recognized that "drug abuse is one of the most serious problems confronting our society today," Von Raab, 489 U.S. at 674, 109 S.Ct. at 1395, and therefore has approved the drug testing of Customs officers in part because "the national interest [in eradicating drug use] could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics." 489 U.S. at 670, 109 S.Ct. at 1393. That said, it follows, even more forcefully, that those vested with the highest executive authority to make public policy in general and frequently to supervise Georgia's drug interdiction efforts in particular must be persons appreciative of the perils of drug use.[3]

_____

[3]The Von Raab situation might be distinguished on the basis that Congress can define the Customs Department's mission and demand sympathy to that mission as a condition of employment, whereas the executive officers here are members of a branch coequal to the Georgia legislature. We regard this distinction as involving a pure question of state law.

Appellants asserted in their complaint that the testing violates the Georgia Constitution, but the district court decided no issues of state law. 28 U.S.C. § 1367 provides that the district courts "may decline to exercise supplemental jurisdiction over a claim" which they otherwise have power to hear if "the claim raises a novel or complex issue of state law . . . ." Id. The decision not to exercise supplemental jurisdiction is reviewed for abuse of discretion. Faucher v. Rodziewicz, 891 F.2d 864, 872 (11th Cir. 1990). In view of the complex state constitutional issues presented here and the interests of comity in this sensitive area of federal-state relations, we cannot conclude the district court abused its discretion. See, e.g., Grant v. Seminole County, Fla., 817 F.2d 731, 732 (11th Cir. 1987) (finding no abuse of discretion where district court failed to explain dismissal of state claim,

But drug use poses significant dangers beyond rendering elected officials unsympathetic to drug interdiction efforts. The nature of high public office in itself demands the highest levels of honesty, clear-sightedness, and clear-thinking. For example, the Lieutenant Governor is the President of the Senate and has other executive duties posed by law; more important, though, the Lieutenant Governor is to replace the Governor should the top executive office become vacant. O.C.G.A. § 45-12-7. The Governor must respond to state emergencies, id. § 45-12-30, and if necessary call out the state militia. Id. §§ 45-12-27; 45-12-28. He can direct state law enforcement agencies. See O.C.G.A. §§ 35-3-8.1; 35-2-33(b). The Governor has broad powers of appointment to important offices, boards, commissions, and so forth. See generally id. § 45-12-50; see also Ga. Const. Art. I., § 2, par. 1 (Governor appoints members of State Board of Pardons and Paroles). It goes without saying that clear judgment is imperative to the position. Likewise, members of the House of Representatives enact laws of general applicability for the state, while the Commissioner of Agriculture leads an agency with broad regulatory powers. See generally id. § 2-2-7 (Commissioner of Agriculture); Ga. Const. art. III (House of Representatives). The positions are particularly susceptible to the "risks of bribery and blackmail against which the Government is entitled to guard." Von Raab, 489

_____

because "[e]xercising pendent jurisdiction over the claim would have required the district court to decide a novel question of state law . . ."). We also decline to decide the issues of state law raised by appellants.

U.S. at 674, 109 S.Ct. at 1395. Simply put, the state's interest in filling these positions with drug-free people is great.[4]

Also, we note that our conclusion is strengthened by our deferential reading of Georgia's appraisal of its own interests. Evaluating the governmental interest is necessarily a policy-based inquiry; and while the importance of electing officials whose probity and judgment are unclouded by the use of unlawful drugs may be self-evident to us, we--whatever our own views might be--would be slow to disregard Georgia's appraisal of that need in the light of cases like Taylor, supra, reminding us that a state's sovereign interests are at stake.

Against Georgia's interests must be balanced plaintiff-appellants' privacy interests. The Supreme Court in Skinner, 489 U.S. at 626, 109 S.Ct. at 1418, noted that drug tests "require employees to perform an excretory function traditionally shielded by great privacy," and Justice Scalia wrote in Von Raab that the drug tests there were "particularly destructive of privacy and

---

[4]Appellants contend that because the test is administered after substantial notice, drug users may simply discontinue their indulgence for a brief period before testing and, thus, defeat the purpose of the test. They say the testing is just ineffective. But, in balancing the Fourth Amendment interests, there is no requirement that a search be the single most effective one a legislature could design. Also, as the Supreme Court noted in Von Raab, "addicts may be unable to abstain for even a limited period of time, or may be unaware of the 'fade-away effect' of certain drugs." 489 U.S. at 676, 109 S.Ct. at 1396 (citations omitted). Persons who would be caught by Georgia's limited testing would seem to be people who are out of control about drugs; these worst cases might be the most dangerous in public office. The testing is not so ineffective as to be unreasonable or irrational in itself.

offensive to personal dignity."  489 U.S. at 680, 109 S.Ct. at 1398 (Scalia, J., dissenting).

But, we think that the intrusion here is even less than that approved in Von Raab.  Here, the test can be taken at the office of the candidate's physician, whereas in Von Raab, the test had to be taken in the company of an (auditory) observer employed by an "independent contractor."  Other aspects bearing on the individual's interests are similar to those approved in Von Raab.  The district court noted that federally-approved privacy guidelines, such as those at 53 Fed. Reg. 11,979 et seq. (1988), serve as the benchmark for laboratory procedures.  The test reveals only the presence or absence of the indicia of the use of illegal drugs.  The results are not made available to law enforcement officers in the event a candidate chooses not to file them (if taken through one's own physician, no state agent need know that the test was administered).  And, much like the Customs agents whose privacy expectations are diminished because physical conditioning and ethical behavior are central to job performance, see Von Raab, 489 U.S. at 679, 109 S.Ct. at 1398, candidates for high office must expect the voters to demand some disclosures about their physical, emotional, and mental fitness for the position.

Because the governmental interests of the state of Georgia outweigh the intrusions on privacy effected by the challenged testing, we hold that O.C.G.A. § 21-2-140, as applied to the appellants, does not violate the Fourth Amendment.

9

Appellants also contend that by barring from the ballot a class of persons (those who refuse to take drug tests), the Georgia legislature has violated the rights of the candidates to run for office and the people to vote for whom they please. In their briefs and at argument, appellants indicated they would characterize the Fourteenth Amendment as creating a nearly absolute barrier to excluding a defined group of persons from the ballot. The Supreme Court, however, has rejected that argument, most recently in Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). There, the Court recognized Missouri's prerogative to exclude from the ballot most candidates for the state judiciary over a mandatory retirement age of seventy years. The Court acknowledged that when states bar a class of candidates from the ballot, "the Equal Protection Clause provides a check on such state authority," but cited Article IV, section 4 and the Tenth Amendment for the proposition that

> our scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives. This rule is no more than a recognition of a State's constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders.

501 U.S. at 462, 111 S.Ct. at 2402 (citations and internal quotation marks omitted).

Gregory guides us in our disposition of the appellants' equal protection claim. There, the Court held that rational basis

10

scrutiny applies to state electoral qualifications not involving a suspect classification. 501 U.S. at 470, 111 S.Ct. at 2406. Under rational basis scrutiny, courts "will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979).

Considering the importance of the mental, emotional, and physical health of high public officials, we cannot conclude that the Georgia legislature acted irrationally. Also, the Georgia statute creates less of a barrier than the one upheld in Gregory: whereas Missouri judicial candidates past the mandatory retirement age were permanently barred from the ballot, Georgia candidates are only barred so long as they cannot (or will not) demonstrate that they are drug-free. Thus we hold that O.C.G.A. § 21-2-140 does not improperly infringe on the rights of people to run and of voters to choose the candidate of their choice.

IV.

Appellants' First Amendment claim is based on their assertion that the "refusal tamely to submit to the government's drug testing edict is itself a protected free speech act similar in nature to refusing to salute a flag or the king's hat set upon a post in the village square." We read this argument as an appeal to the rationale of cases like Communist Party of Indiana v. Whitcomb, 414

11

U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974), which invalidated a state statute conditioning ballot access on the filing of an affidavit disavowing the overthrow of state and national governments, and Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), which held that exclusion of a member of the Georgia House of Representatives based on his stated opposition to the Vietnam war violated the First Amendment. We think these cases are distinguishable in that they involve pure speech acts, divorced from unlawful conduct.

In that respect, this case is more like United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), where the court upheld against a First Amendment challenge the prosecution of a young man who burned his draft card, ostensibly in an effort to persuade others to oppose the Vietnam War. There, the Court stated, "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea." 391 U.S. at 376, 88 S.Ct. at 1678. The Court went on, however, to entertain the "assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment." Id. Against this backdrop, the Court held that government regulation of conduct containing "speech and nonspeech" elements is "sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the

12

incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377, 88 S.Ct. at 1679.

Georgia's drug-testing statute passes muster under the framework of O'Brien. First, it is generally within the power of the state of Georgia to prescribe qualifications for its elected officials. See Gregory, 501 U.S. at 463, 111 S.Ct. at 2402.

Second, the statute furthers a substantial governmental interest, as described in the Fourth Amendment analysis above.

Third, the government's purpose is not suppression of free expression. The purpose, as we concluded above, is ensuring that high public officials to whom immense responsibilities are entrusted possess the judgment, probity, and alertness required of them. Anyway, it is doubtful whether the statute has even the effect, let alone purpose, of restricting speech rights. We think an audience would much more clearly perceive the intended message of one who burns a draft card than the message of one who declines to take a drug test. See generally Clark v. Community for Creative Non-Violence, 468 U.S. 288, 294, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (noting that First Amendment protection of conduct depends on whether conduct "would reasonably be understood by the viewer to be communicative").

Fourth, the regulation is no more restrictive of expression than is necessary. If Georgia's goal is to preclude the nomination or election of people addicted to drugs then it must require, rather than simply advise, that prospective candidates submit to

13

testing. Appellants have not suggested a less restrictive way for Georgia to accomplish its stated objective of keeping drug users out of office. Therefore, we conclude that whatever impact the Georgia statute has on speech does not violate the First Amendment.

V.

No party contends in this appeal that the drug testing in this case is for normal law enforcement. The controversy is about Georgia's rights and the special need Georgia believes it has to take a step to deter illicit drug users from filling important state offices. Especially in the light of federalism and the Tenth Amendment, we are cautious in interfering with the states on matters central to their governance.[5] O.C.G.A. § 21-2-140 does not violate the First, Fourth, or Fourteenth Amendment rights of

---

[5]By the way, Georgia publishes almost no official legislative history. And, we do not accept an academic law journal's summary of a post-enactment telephone interview (not conducted under oath) with a single legislator (even one of the sponsors of a bill) as competent legislative history. See, e.g., Blanchette v. Connecticut General Ins. Corps., 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974) (rejecting use of "subsequent legislative history" because "[P]ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent . . . . Such statements represent only the personal views of these legislators."). Nor do we -- on the basis of such "history" -- accept that Georgia's drug testing law is merely or chiefly symbolic, although that which is symbolic may still have great significance. In their brief, plaintiff-appellants cited to no such law review summaries; and we think they -- given the lack of true legislative history available -- were right not to do so.

candidates for high office in Georgia; we affirm the judgment of the district court.[6]

AFFIRMED.

---

[6]We are aware that qualifying to run for the pertinent public offices is only a few months away.  We also recognize that plaintiff-appellants will likely seek review of our decision.  For that reason, we have tried to be expeditious in announcing the decision.  Because speed seems important, we have perhaps not said all that we could -- especially about history; but we think we have said enough to indicate our general point of view.