**M.C. ENGLISH, Plaintiff,**

v.

**TALLADEGA COUNTY BOARD OF EDUCATION; Lance Grisset, etc., Dr. Howard Strickler, etc., EDPM, Inc., etc., Jimmy Hayes, etc., Defendants.**

No. CV95–H–1317–S.

United States District Court,
N.D. Alabama,
Southern Division.

Sept. 3, 1996.

---

Huel M. Love, Sr., Love Love & Love, Talladega, AL, Charles F. Norton, Paden & Paden, Birmingham, AL, for plaintiff M.C. English.

Carl E. Johnson, Jr., Bishop Colvin Johnson & Kent, Birmingham, AL, for defendants Talladega County Board of Education, Lance Grisset, Jimmy Hayes.

## MEMORANDUM OF DECISION

HANCOCK, Senior District Judge.

The Court has before it the motion for summary judgment filed by defendants the Talladega County Board of Education ("the Board"), Lance Grisset ("Grisset"), and Jimmy Hayes ("Hayes") on March 4, 1996. Pursuant to the Court's March 5, 1996 Order, the motion was deemed submitted on April 2, 1996, without oral argument.

### I. Procedural History

Plaintiff M.C. English ("plaintiff") initiated this action on May 25, 1995 by filing a ten-count complaint against the Talladega County Board of Education, Lance Grisset, Dr. Howard Strickler, Jimmy Hayes, and EDPM, Inc. Plaintiff, a mechanic's helper with the Talladega County Board of Education, claims that defendants violated his constitutional rights by requiring him to undergo mandatory random drug testing, by failing to follow prescribed procedural safeguards with regard to urine testing procedures, and by wrongfully terminating him as the result of improper drug test results. Count I asserts a § 1983 substantive due process claim based on defendants' violation

of plaintiff's fundamental right under the 4th Amendment to be free from unreasonable search. Count II asserts a § 1983 claim for defendants' failure to comply with procedural safeguards assured to plaintiff by federal law. Count III asserts a § 1983 claim for defendants' alleged violation of equal protection by treating Department of Transportation ("DOT") covered employees and "non-DOT" employees differently with regard to drug testing. Counts Four through Ten included various state law claims based on defendants' mandatory drug testing of plaintiff. On July 17, 1995, the court declined to exercise supplemental jurisdiction over the state law claims and dismissed those claims without prejudice pursuant to 28 U.S.C. § 1367(c). The Court has jurisdiction over the claims asserted in Counts I, II, and III, because plaintiff's claims arise from the federal civil rights statutes. *See* 28 U.S.C. §§ 1331, 1343.

On February 2, 1996, the Court granted a motion for summary judgment filed by defendants Dr. Howard M. Strickler and EDPM, Inc. Although the Court's February 2, 1996 Order did not dispose of all claims against all parties and was not made final under Fed. R.Civ.P. 54(b), plaintiff attempted to appeal that order to the Court of Appeals. On July 18, 1996, the Eleventh Circuit dismissed plaintiff's appeal for lack of jurisdiction under 28 U.S.C. § 1291.

Meanwhile, the remaining defendants (the Board, Hayes, and Grisset), had filed a motion for summary judgment on March 4, 1996. In support of that motion, defendants[1] filed an evidentiary submission containing the Affidavit of Jimmy Hayes with exhibits,[2] a copy of plaintiff's deposition, and the deposition of Darwin Garvin. Defendant also submitted a brief, including a statement of undisputed facts.

Plaintiff responded with an evidentiary submission of his own, including references to evidence already in the record. Plaintiff directed the Court's attention to various documents concerning the Department of Transportation regulations that governed defendants' drug testing program, a number of documents relating to plaintiff's drug test, termination, hearing, and reinstatement, and the depositions of Benjamin Padgett and Dr. Howard Strickler. In addition, plaintiff submitted new and additional evidence, consisting of his own affidavit, an excerpt from Dr. Strickler's deposition, the Board's drug testing policy, some "Regulatory Guidelines" from the Federal Highway Administration, an EDPM document entitled "An Overview of Alcohol & Drug Rules," a letter plaintiff received from the Board informing him that he had been terminated, a newspaper article reporting the Board's action in terminating plaintiff, a list of Board employees to be drug tested, a blank drug testing consent form, the deposition of Patricia Baker, and a urine sample custody and control form. Plaintiff also submitted a brief.

## II. Standards for Evaluating a Summary Judgment Motion

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the

---

1. In this Memorandum, references to "defendants" are to the remaining defendants: the Board, Grisset, and Hayes. Grisset is the Superintendent of the Board, and Hayes is the Assistant Superintendent and Drug Program Coordinator.

2. The Exhibits included Hayes' job description, two drug use policies adopted by the Board, an agreement between the Board and EDPM with an accompanying "policy statement," a copy of the drug testing policy adopted by the Board,

records of notice given to plaintiff of the drug testing policy, two consent forms signed by plaintiff agreeing to submit to the drug tests, plaintiff's job description and the description of a closely-related job with similar duties, two sample maintenance form that plaintiff would be responsible for filling out on a regular basis, a transcript of plaintiff's post-termination hearing before an Employee Review Panel, and the Employee Review Panel's decision to reinstate plaintiff.

pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249, 106 S.Ct. at 2510–11.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick,* 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property,* 941 F.2d 1428 (11th Cir.1991) (*en banc* )).

If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick,* 2 F.3d at 1115. If the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. If the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick,* 2 F.3d at 1115–16. The affirmative showing may be accomplished by reference to any combination of the following: pleadings; deposition testimony of a party or its witness; affidavits; responses to interrogatories or failure to respond to interrogatories; requests for admission and responses thereto; and other exchanges between the parties that are in the record. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991); *see also Celotex,* 477 U.S. at 332, 106 S.Ct. at 2557–58 (Brennan, J., dissenting). If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

### III.  Undisputed Relevant Facts

The record reveals the following undisputed facts. Plaintiff is employed as a mechanic's helper for the Board. (English Aff.). Plaintiff's job duties include diagnosing and repairing mechanical problems with the Board's fleet of school buses, as well as occasionally driving buses to and from the maintenance shop. (Hayes Aff., ¶ 15 & Exhibit J;

English Affidavit). Plaintiff is also required to perform safety-related inspections of the Board's school buses. (Hayes Aff., ¶ 15 & Exhibits J–K). Plaintiff's occasionally drives buses loaded with oil for on-site oil changing, and he might infrequently be asked to drive a regular school bus route. (Hayes Aff., ¶ 14). Plaintiff had not, prior to January 1995, been reprimanded or disciplined by the Board. (English Aff.).

Defendants have submitted unrefuted evidence that 6,000 of the Board's 8,000 students rely on school buses to get to and from school, and so the Board maintains a fleet of 130 buses. (Hayes Aff., ¶ 16(a)). The roads that the Board's buses are required to traverse are "often poorly designed and maintained." (Id., ¶ 16(b)). The majority of the Board's buses are over ten years old. (Id., ¶ 16(c)).

Congress enacted a statute, the Omnibus Transportation Employee Testing Act of 1991, that required all employers to test operators of certain vehicles for drugs and alcohol. See 49 U.S.C. § 31306(b). Congress directed the Secretary of Transportation to promulgate regulations on the subject. Id. The relevant regulations appear in 49 C.F.R., part 382. The drug testing requirement applies to any employee who operates a "commercial motor vehicle" and who is required to have a commercial driver's license. 49 C.F.R. § 382.103(a)(1). The parties agree that plaintiff's job duties require him to operate "commercial motor vehicles," and that he is required to have a commercial driver's license. (English Aff., Hayes Aff. ¶ 14–15).

The regulations require all employers to conduct alcohol and drug tests in accordance with certain procedures, which are detailed below. See 49 C.F.R. § 382.105. The applicable starting date mandated for the Board's testing program was January 1, 1995. 49 C.F.R. § 382.115(a). The regulations require various types of tests, including random drug tests of all covered employees. 49 C.F.R. § 382.305(a). Employers are required to formulate drug and alcohol use and testing policies. 49 C.F.R. § 382.601. The regulations also specify that employees who test positive are to be referred to a substance abuse professional for evaluation and treatment. 49 C.F.R. § 382.605.

The DOT regulations concerning the testing procedures for employers are very detailed. The regulations establish security measures for the test site, chain of custody procedures for urine samples, and guarantees of privacy for tested employees. 49 C.F.R. § 40.25(b, c, e, f(7)). The parties agree that the regulations required the Board's tests to be conducted using the "split sample" method, see 49 C.F.R. § 40.25(f)(10)(i)(B), which is described in great detail in § 40.25(f)(10)(ii). Generally, the "split sample method" requires the testing site to take a sample of urine from the employee, split it into two samples of specified volumes, and send both samples to the laboratory. 49 C.F.R. § 40.25(f)(10)(ii)(A–D). Only the first sample is tested initially, and if the result is positive, the employee may request that the second portion of the sample be tested at a different laboratory certified by the Department of Health and Human Services. 49 C.F.R. § 40.25(f)(10)(ii)(E). The employee's request for a retest must be honored if the request is made within 72 hours of the employee's receipt of notification of the positive test result. Id. The Federal Highway Administration's "Alcohol and Drug Testing Requirements for Commercial Motor Vehicle Drivers," attached to plaintiff's Brief as Exhibit 3, recite that "[t]he rules do not specify who shall pay for the testing of the split specimen and the FHWA leaves it to labor-management negotiations to decide who pays."

When a test shows a positive result, the testing lab is required to inform the Medical Review Officer (MRO) designated by the employer, who is then required to inform the employee and give the employee an opportunity to explain the result or request a test of the split sample. 49 C.F.R. § 40.33(a)(2), (f). If the employee requests a retest of the split sample within the 72-hour period designated by the regulations, and "if the split specimen is unavailable, inadequate for testing or untestable, the MRO shall cancel the test and report cancellation and the reasons for it to the DOT, the employer, and the employee." 49 C.F.R. § 40.33(f).

In accordance with the regulations, the Board adopted a drug testing policy on November 16, 1994. (Hayes Aff., Exhibit F). The policy applied to all employees, not just those required to be tested under the DOT regulations, and essentially repeated the procedures specified by the regulations. (*Id.*). The policy stated that employees would be disciplined for testing positive for drugs, including the sanction of termination. (*Id.*). Finally, with respect to split sample retests, the policy provided that employees requesting retests could be required to pay the cost of the retest "in advance." (*Id.*).

The record contains a certificate, signed by plaintiff, to the effect that he received a copy of the Board's drug testing policy on December 12, 1994. (Hayes Aff., Exhibit G). Two days later, plaintiff signed a consent form authorizing the Board to test him for drugs. (Hayes Aff., Exhibit H). Plaintiff did not object to signing the consent form. (English Depo. at 63). Plaintiff testified that he had used marijuana as often as weekly up until November of 1994, and stopped then because of the impending drug tests. (English Aff.; English Depo. at 51–53).

On January 18, 1995, plaintiff was ordered by the Board to report for drug testing to a doctor's office. (English Depo. at 65–69). Before taking the test, Plaintiff signed another consent form "voluntarily." (English Depo. at 74–76). Plaintiff testified that he was not embarrassed by any of the test procedures, and described the test as being equivalent to a normal doctor's office visit. (*Id.* at 72–73). However, the testing facility failed to split plaintiff's sample in accordance with the DOT regulations. (*Id.* at 71).

The initial test of plaintiff's specimen was positive for cannabinoids (indicating marijuana use). Plaintiff received a message to call Dr. Strickler, the Board's MRO, on January 23, 1995. (English Depo. at 76). Upon returning Strickler's call, plaintiff was told of the positive result, asserted that the result was inaccurate, and immediately requested a retest. (*Id.* at 77–78). Dr. Strickler told plaintiff that there was no split sample, but he could get another test of the same sample

after paying $85. (*Id.*). Plaintiff did not pursue this option, and instead asked if he could give a new specimen for testing. (*Id.* at 85). The Board denied this request. (*Id.*).

Plaintiff was suspended with pay for fifteen days. (*Id.* at 87–88). On February 3, 1995, the Board voted to terminate plaintiff's employment, and informed plaintiff by letter that his termination was being considered. (Termination Letter, attached to plaintiff's Brief as Exhibit 1). Plaintiff appeared before the Board, represented by legal counsel, and protested the termination, but the Board voted to terminate him. (English Depo. at 92–95). Following his termination, plaintiff requested a hearing before a Fair Dismissal Panel; that hearing was held on June 2–3, 1995, and plaintiff was again represented by counsel. (Hayes Aff., Exhibit N). After hearing testimony and receiving exhibits, the Panel voted to reinstate plaintiff, with full back pay and benefits. (Hayes Aff., Exhibit O). The Panel also ordered the Board to expunge the test results and termination proceedings from plaintiff's employment records. (*Id.*). Plaintiff has returned to work and is in good standing, and testified that he has been treated fairly by his supervisors since returning. (English Depo. at 96, 99).

### IV. Applicable Substantive Law and Analysis

Plaintiff presents three claims against the defendants. First, he alleges that the drug test was an unreasonable search under the Fourth Amendment. Second, he alleges that the Board deprived him of procedural due process by testing him without complying with the procedural safeguards required by the DOT regulations. Third, he asserts an equal protection claim, asserting that the Board unconstitutionally treated DOT and non-DOT covered employees differently with respect to testing procedures, giving only the DOT employees the benefit of the procedural safeguards required by the regulations. All three claims proceed under the vehicle of § 1983, and the Court will address each claim in turn.[3]

---

3. Before delving into an analysis of plaintiff's     three claims, the Court notes the different issues

## A. Unreasonable Search

Plaintiff first contends that the Board (and individual defendants) violated his Fourth Amendment right to be free from unreasonable searches by the drug testing program. Defendants raise three argument in support of their motion for summary judgment: (1) although the drug test was a "search" covered by the Fourth Amendment, it was not, as a matter of law, "unreasonable"; (2) plaintiff consented to the search; and (3) the individual defendants claim qualified immunity.

■ The parties agree that the defendants' collection of a urine sample from plaintiff was a "search" governed by the Fourth Amendment. *See Skinner v. Railway Labor Execs. Ass'n,* 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989); *Chandler v. Miller,* 73 F.3d 1543, 1545 (11th Cir.1996). Once a court determines that a particular activity is governed by the Fourth Amendment, the relevant inquiry becomes one of "reasonableness." *Vernonia School Dist. 47J v. Acton,* —— U.S. ——, ——, 115 S.Ct. 2386, 2390, 132 L.Ed.2d 564 (1995). The general rule in criminal cases is that searches must be accomplished pursuant to a warrant issued on a showing of probable cause. *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414. However, "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable,'" the Supreme Court has held that the "reasonableness" of a search is determined by weighing the individual's privacy interest against the government's interest in the search. *Id. See also Chandler,* 73 F.3d at 1545.

■ So, the initial inquiry mandated by *Skinner* is whether the Board presents "special needs" justifying the use of the balancing test. *Skinner* itself answers that question, and resolves most of the other issues related to plaintiff's Fourth Amendment claim. In *Skinner,* the Supreme Court examined federal regulations that required the testing of railroad employees for drugs and alcohol following any "major train accident," even in the absence of individualized suspicion of drug or alcohol use. *Skinner,* 489 U.S. at 609, 109 S.Ct. at 1409. The Supreme Court noted that this "triggering event" was similar to random testing, since employees could not predict the occurrence of "major train accidents." *Id.* at 609, 109 S.Ct. at 1409.

The Court held that the railroad's concern with safety presented a "special need" that justified the balancing test. *Id.* at 620, 109 S.Ct. at 1415. Here, the same motivation is behind the DOT regulations and the Board's policy—plaintiff's duties in maintaining and driving school buses are certainly "safety-sensitive,"[4] and so *Skinner* requires the Court to weigh plaintiff's legitimate expectations of privacy against the Board's need to promote safety.

Regarding the privacy intrusion inherent in urine tests, the Supreme Court wrote in *Skinner* that

> [w]e recognize, however, that the procedures for collecting the necessary samples, which require employees to perform an excretory function traditionally shielded by great privacy, raise concerns not implicated in blood or breath tests. While we would not characterize these additional privacy concerns as minimal in most contexts, we note that the regulations endeavor to reduce the intrusiveness of the collection process. The regulations do not require that samples be furnished under the direct

---

raised by each. The Fourth Amendment claim is concerned only with the defendants' requirement that plaintiff submit to a drug test, and the particulars of that test. Defendants' use of the test results, in violation of the DOT regulations, is a matter that is to be resolved exclusively within the procedural due process framework. *See Burka v. New York City Trans. Auth.,* 747 F.Supp. 214, 218 (S.D.N.Y.1990). Defendants' failure to accord plaintiff the procedural safeguards required by the DOT regulations has no bearing on the reasonableness of the search in the first place.

4. The Hayes Affidavit explains in detail the Board's rationale for concluding that plaintiff's position is "safety-sensitive," and plaintiff has not attempted to rebut this showing. In addition, the Court notes that the DOT regulations, although not controlling, recite that inspecting, servicing, repairing, and driving covered motor vehicles (including school buses) are all "safety-sensitive" functions. *See* 49 C.F.R. § 382.107.

observation of a monitor, despite the desirability of such a procedure to ensure the integrity of the sample. The sample is also collected in a medical environment, by personnel unrelated to the railroad employer, and is thus not unlike similar procedures encountered often in the context of a regular physical examination.

*Skinner,* 489 U.S. at 626–27, 109 S.Ct. at 1418. *See also Vernonia School District,* ── U.S. at ──, 115 S.Ct. at 2393 (finding urine tests' intrusion into the privacy of high school students "negligible" under similar conditions to those in *Skinner* ).

The Court in *Vernonia School District* also noted two other aspects of the drug tests before it that limited their intrusiveness: (1) the samples would be screened only for drugs, not examined for other private medical information; and (2) all samples would be screened for the same drugs. *Vernonia School District,* ── U.S. at ──, 115 S.Ct. at 2393.

Viewed in light of the factors enunciated in *Skinner* and *Vernonia School District,* the procedures experienced by plaintiff were minimally intrusive. The undisputed evidence in the record indicates that plaintiff's test was conducted in a doctor's office by personnel not related to the Board, no one observed plaintiff produce the sample, the sample was screened only for drugs, and all employees were tested for the same drugs.[5] Plaintiff's deposition testimony confirms the non-intrusive nature of the process; he testified that he did not find the procedure embarrassing in any way, and compared the experience to a normal doctor's office visit. (English Depo. at 65–69, 72–73).

There is another aspect of this case that further diminishes the intrusion plaintiff suffered. In *Skinner,* the Supreme Court re-

marked that "the expectations of privacy of covered [railroad] employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Skinner,* 489 U.S. at 627, 109 S.Ct. at 1418. *See also Vernonia School District,* ── U.S. at ──, 115 S.Ct. at 2393 (comparing student athletes' diminished expectations of privacy to those of adults who choose to participate in a "closely regulated industry").

Here, plaintiff, like the railroad workers in *Skinner,* chose to work in an industry subject to regulation to achieve safety goals. He can thus claim only diminished expectations of privacy. This reduced expectation, coupled with the negligible intrusions involved in the Board's testing procedures, leads the Court to conclude that plaintiff's privacy interest is entitled to only slight weight in this case.

Weighed against this small privacy interest is the Board's compelling interest in ensuring the safety of children riding school buses. Again, *Skinner* is controlling in this regard. In *Skinner,* the Court noted that railroad employees "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences. ... employees who are subject to testing ... can cause great human loss before any signs of impairment become noticeable to supervisors or others." *Skinner,* 489 U.S. at 628, 109 S.Ct. at 1419. The Court went on to note that the essentially-random aspect of the tests in *Skinner* (triggered by unpredictable train accidents) served an important deterrent purpose, "increasing the likelihood that employees will forego using drugs or alcohol while subject to being called for duty." *Id.* at 630, 109 S.Ct. at 1420.[6]

---

**5.** Most of the information in this sentence comes from the Affidavit of defendant Hayes and the Board's drug testing policy attached to the affidavit as Exhibit F.

**6.** Plaintiff argues that the Board's testing policy was unwarranted because the Board had no reason to suspect that drug use was occurring in its workforce. The Eleventh Circuit has held that "the level of documented evidence of a past problem" is relevant to assessing the government's interest in drug testing cases. *See Chan-*

*dler,* 73 F.3d at 1545. However, the Eleventh Circuit has also recognized that drug tests can also be justified in the absence of such evidence, if drug use is "totally incompatible with the nature of the position." *Id.* at 1546. The Court recognizes that the Board has supplied no evidence of a past problem with drug use among its employees, but the Court is convinced both that drug use is totally incompatible with plaintiff's position and that Congress and the DOT found enough evidence of a problem to require the Board to test its employees. *See generally* S.Rep.

This case presents facts nearly identical to those in *Skinner*. Here, the unrebutted Affidavit of defendant Hayes establishes the obvious—that an employee who inspects, repairs, and drives large buses (sometimes filled with containers of oil) cannot be impaired by drug use. Sloppy inspection, repair, or driving could all create the potential for great human loss, particularly when one considers buses loaded with children. And, the random nature of the Board's testing serves the same deterrent effect as the tests in *Skinner*. And, as in *Skinner*, requiring the Board to base drug testing decisions on individualized suspicion would severely undercut the utility of the tests; the Supreme Court accepted the argument in *Skinner* that railroad employees could cause great injury before signs of drug use were evident, and the same is true here.

So, to conclude, the Board's intrusion on plaintiff's privacy interests was minimal, and was justified by compelling governmental needs that would be frustrated if individualized suspicion were required. *Skinner* controls this case, and the Court concludes that defendants' drug testing policies were not "unreasonable" under the Fourth Amendment.[7]

### B. Procedural Due Process

Plaintiff's next claim is that defendants deprived him of the procedural safeguards guaranteed him under the DOT regulations, in violation of 42 U.S.C. § 1983. Although this claim is not a constitutional due process claim, the Court believes that it is controlled by the Eleventh Circuit's holding in *McKinney v. Pate*, 20 F.3d 1550 (11th Cir.1994) (en banc).

In *McKinney*, the Eleventh Circuit held that procedural due process claims against a state could not stand where the right involved was merely a property right, as opposed to a fundamental right, and the state provided adequate procedures for the protection of the property right. *Id.* at 1565. *McKinney*, like the present case, involved the claim of a state employee that he had been wrongfully terminated. *Id.* at 1554–55.

Here, plaintiff is a state employee with a property interest in his employment. The Court has already concluded that plaintiff suffered no deprivation of his fundamental right to be free from unreasonable searches, and so plaintiff's claims carry no greater weight than those examined in *McKinney*. In addition, plaintiff can hardly contest the adequacy of Alabama's procedural safeguards; the Review Panel that heard his case ordered him reinstated with full benefits. All that remains is for the Court to take the easy logical step of concluding that *McKinney*'s rationale is applicable equally to both constitutional due process claims and procedural claims based upon the DOT regulations. There is no reason for the Court to conclude that the safeguards provided by the DOT regulations are of greater weight than those guaranteed by the Fourteenth Amendment; in fact, the natural conclusion would be that the constitutional protections are entitled to far more weight than those created by the Department of Transportation.

Since plaintiff alleges the deprivation of only a property right, and since Alabama provided plaintiff with adequate procedures to safeguard that right, *McKinney* requires the Court to conclude that plaintiff has not been deprived of any procedural rights. Defendants' motion on Count II is due to be granted.[8]

No. 54, 102d Cong., 1st Sess. (1991) (reciting Congressional findings of fact regarding rampant drug use among transportation employees).

7. In light of this conclusion, the Court need not address the individual defendants' qualified immunity arguments or the consent defense.

8. Plaintiff's Affidavit and Brief raises another potential procedural claim, that he was not offered counseling and rehabilitation assistance by the Board after his positive drug test, although the DOT regulations allegedly required both. As an initial matter, plaintiff's affidavit recites that he stopped smoking marijuana in November 1994 and has not resumed since; the Court does not understand why plaintiff requires rehabilitation or counseling. More importantly, this claim, like the one discussed in the text, involves only a procedurally-infirm deprivation of a property right, and so *McKinney*'s holding is equally applicable to it.

## C. Equal Protection

The equal protection claim raised in plaintiff's complaint reads, *in toto,* as follows:

Defendants' policy, custom and practice of treating "non-DOT" employees differently and denying this class of employees the statutory and procedural employee drug testing safeguards described in 49 CFR Part 40 and adopted as Board policy is not rationally based and violates the equal protection guarantee of the Fourteenth Amendment of the United States Constitution and the Alabama Constitution.

Complaint at ¶ 69. Plaintiff's Brief on this issue makes only the argument that defendant failed to follow the proper procedures in handling his testing, a contention that was dealt with in the context of Count II.

█ The Court will not reach the merits of Count III, however, because it is convinced that plaintiff lacks standing to raise this claim. Neither of the parties has addressed this issue, but standing is part of the "case or controversy" jurisdictional requirement of Article III, and this Court has the obligation to examine it *sua sponte. See Juidice v. Vail,* 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977); *Cuban American Bar Ass'n v. Christopher,* 43 F.3d 1412, 1422 (11th Cir.1995); *In re Weaver,* 632 F.2d 461, 462 n. 6 (5th Cir.1980).

Plaintiff's claim is that defendants made an impermissible classification between DOT and non-DOT employees, giving the former heightened procedural safeguards and disadvantaging the latter. The problem is that plaintiff falls within the class of DOT covered employees, and so was entitled to (and received) the greater safeguards of 49 C.F.R. §§ 40.25 and 40.33. Indeed, plaintiff was reinstated to his employment by the Review Panel because the Board failed to follow those regulations—all three panel members expressly cited the regulations in their opinions. (Hayes Aff., Exhibit O). Plaintiff cannot assert a claim based on the lesser procedural safeguards allegedly accorded the non-DOT employees, because he can allege no injury to himself traceable to the Board's alleged treatment of the non-DOT employees. Because standing requires an injury-in-fact traceable to the challenged conduct, *Cuban American Bar Ass'n,* 43 F.3d at 1423, plaintiff lacks standing to pursue this claim.

█ In addition, allowing plaintiff to pursue Count III would run afoul of one of the well-established prudential aspects of standing. Generally, a plaintiff may not invoke the legal rights of others, but must pursue claims on behalf of himself only. *Cuban American Bar Ass'n,* 43 F.3d at 1423. Here, plaintiff attempts to assert an equal protection claim based on a classification that disadvantages non-DOT employees of the Board. His claim is predicated wholly on the Board's infringement of the non-DOT employees' rights, and his status as a DOT employee precludes him from raising this issue.

Because plaintiff lacks standing to pursue the claim asserted in Count III, that claim will be dismissed. The Court will not reach the merits of Count III.[9]

In conclusion, the relevant facts are undisputed, and defendants are entitled to judg-

---

9. However, the Court notes that it views the merits of Count III as exceedingly thin. The equal protection claim asserted by plaintiff does not allege a suspect or quasi-suspect classification, and the Court has already determined that no fundamental right is involved. So, the Court would review the Board's classification under the "rational basis" standard. *E.g., Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995). Even assuming that the record supports plaintiff's contention that the Board treated DOT and non-DOT employees differently (plaintiff has directed the Court to no such evidence), the Board could have a rational reason to treat the two sets of employees differently for the simple reason that one set is covered by federal regulations, while the other is not. The Board could rational-ly believe that the added procedural safeguards required by the DOT regulations increase the costs of testing and produce little benefit in accuracy, thus justifying non-application of those safeguards to non-DOT employees. This example of a rational basis for the Board's alleged action is surely sufficient to carry the day under minimal equal protection scrutiny. *Cf. Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Panama City Med. Diagnostic Ltd. v. Williams,* 13 F.3d 1541, 1545–46 (11th Cir.1994) (an action is permissible under the rational basis standard "if 'any set of facts may be reasonably conceived of to justify' " it, and courts must be particularly deferential to state decisions that define the class of persons subject to a regulatory requirement).

ment as a matter of law. Therefore, defendants' motion for summary judgment is due to be granted, and a separate Order in accordance with this Memorandum of Decision will be entered.[10]

**10.** At this time, the Court will not make any finding regarding whether plaintiff's prosecution of this action to this point has been frivolous. *See* Fed.R.Civ.P. 11. However, based upon its review of the record and plaintiff's claims, the Court believes that further steps by plaintiff and plaintiff's counsel in pursuing this action would necessitate re-examining this issue.