1998-NMCA-062

958 P.2d 1244

**Ernest JARAMILLO, Plaintiff–Appellant,**

**v.**

**CITY OF ALBUQUERQUE and Arthur Blumenfeld, Ph.D., Chief Administrative Officer, Defendants–Appellees.**

**No. 18051.**

Court of Appeals of New Mexico.

April 6, 1998.

Paul Livingston, Albuquerque, for Appellant.

Robert M. White, City Attorney, Bruce T. Thompson, Assistant City Attorney, Albuquerque, for Appellees.

*OPINION*

HARTZ, Chief Judge.

{1}  Plaintiff, Ernest Jaramillo, was fired from his position as a mechanic for the City

of Albuquerque (City) when a drug test on May 22, 1991 revealed metabolites of marijuana in his urine. On November 24, 1993 he filed suit for declaratory and compensatory relief against the City and its Chief Administrative Officer, Arthur Blumenfeld, in his official capacity. After a bench trial on June 25, 1996, the district court entered judgment for Defendants on November 8, 1996. Jaramillo contends on appeal that the drug test violated his rights under the United States Constitution and that it was also unlawful because it was pursuant to a City policy adopted in violation of the state Open Meetings Act. Agreeing with his constitutional claim, we reverse and remand for further proceedings in district court. We need not address his claim under the Open Meetings Act.

### BACKGROUND

{2} City regulations in effect in 1991 provided for drug testing in a variety of circumstances. Under City Administrative Instructions Nos. 121 (revised) and 123 (revised), all offers of employment were conditioned on the applicant's passing a drug test, and all City employees were subject to drug testing on reasonable suspicion. City employees could also voluntarily refer themselves to an employee assistance program for help with drug abuse. One class of employees singled out for special treatment consisted of those issued a City Vehicle/Equipment Operator's Permit. Such a permit would be issued only after the employee passed a drug test. Among the employees required to have City permits were those required to have a state commercial driver's license (CDL) because of the type of vehicle they operated. Drivers of heavy vehicles—those with a gross vehicle weight exceeding 26,000 pounds—must have a CDL. See NMSA, § 66–1–4.3(K) (1990); NMSA 1978, § 66–5–59(A) (1989).

{3} When his drug test was administered, Jaramillo was a mechanic assigned to the Fleet Management Division of the City's General Services Department. According to the City, Jaramillo was informed on October 31, 1990 that his job required him to obtain a CDL. Jaramillo obtained a CDL on April 19, 1991. He missed his first scheduled drug test because he was on sick leave. On May 2, 1991 he was notified that his test would be on May 22. As stated above, he failed that test and was fired.

{4} At the lime of his firing Jaramillo worked only on vehicles with a gross vehicle weight less than 26,000 pounds. Prior to July 1990, however, he had worked at the City's Pino Yard. The Pino Yard handled maintenance on heavy vehicles. Vehicle maintenance involves test driving the vehicles being worked on.

### DISCUSSION

{5} It is settled law that requiring a person to provide a urine sample for drug testing constitutes a search under the Fourth Amendment to the United States Constitution. See Skinner v. Railway Labor Executives' Ass'n., 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The Fourteenth Amendment applies the requirements of the Fourth Amendment to state and local governments. See Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). Although the Constitution ordinarily requires a warrant and probable cause to justify a search, warrantless drug testing of public employees without probable cause can be justified by "special needs beyond normal law enforcement." Skinner, 489 U.S. at 620, 109 S.Ct. 1402 (internal quotation marks omitted).

{6} For example, in Skinner the Supreme Court upheld suspicionless drug testing of railroad workers who had been involved in certain kinds of train accidents or who had violated certain safety rules. Id. at 606, 634, 109 S.Ct. 1402. Weighing the privacy interests of railroad employees against the government interest in safety, it noted that the intrusion on privacy was a limited one, id. at 627–28, 109 S.Ct. 1402, the employees' expectations of privacy were "diminished by reason of their participation in an industry that is regulated pervasively to ensure safety," id. at 627, 109 S.Ct. 1402, and the government interest was compelling because "[e]mployees subject to the tests dis-

charge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences," *id.* at 628, 109 S.Ct. 1402.

{7} Similarly, the Supreme Court has permitted "suspicionless testing of [Customs Service] employees who apply for promotion to positions directly involving the interdiction of illegal drugs, or to positions that require the incumbent to carry a firearm." *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 679, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Such testing is justified by the "compelling interests in safeguarding our borders and the public safety." *Id.* at 677, 109 S.Ct. 1384.

{8} More recently, however, the Supreme Court has emphasized the limits to the power to conduct suspicionless drug testing. A Georgia statute requiring candidates for elective office to pass a drug test was struck down because such testing did not "fit within the closely guarded category of constitutionally permissible suspicionless searches." *Chandler v. Miller,* 520 U.S. 305, ——, 117 S.Ct. 1295, 1298, 137 L.Ed.2d 513 (1997). The Court said that the statute served only a symbolic purpose, *id.* 117 S.Ct. at 1304–05, and was "not needed and [could not] work to ferret out lawbreakers," *id.* at 1304.

■ {9} To justify the drug testing in this case, the City points to the dangers of driving heavy vehicles. Mechanics who work on such vehicles occasionally drive the vehicles in the course of their repair work. At trial the City presented evidence indicating that a 26,000–pound vehicle is more dangerous than a passenger car.

{10} Because of concern about these dangers, the federal Department of Transportation has issued regulations requiring interstate carriers to subject drivers of vehicles weighing more than 26,000 pounds to drug testing in a variety of circumstances: preemployment, 49 C.F.R. § 382.301 (1997); post-accident, *id.* at § 382.303; random selection, *id.* at § 382.305; reasonable suspicion, *id.* at § 382.307; return-to-duty, *id.* at § 382.309; and as a follow-up to a positive test, *id.* at § 382.311. These regulations have been upheld in court. *See International Brotherhood of Teamsters v. Department of Transp.,* 932 F.2d 1292, 1306 (9th Cir.1991) (biennial, preemployment, post-accident, and random drug testing of drivers for interstate motor carriers). A similar local law has also been affirmed. *See Keaveney v. Town of Brookline,* 937 F.Supp. 975, 983–87 (D.Mass.1996) (random testing of city employees who drive vehicles weighing more than 26,000 pounds).

{11} Courts have also upheld suspicionless drug testing of drivers of other types of vehicles. *See National Treasury Employees Union v. Yeutter,* 918 F.2d 968, 977 (D.C.Cir. 1990) (random drug testing of Department of Agriculture drivers who primarily carry documents and chauffeur officials); *American Fed'n of Gov't Employees v. Skinner,* 885 F.2d 884, 892–93 (D.C.Cir.1989) (random and periodic drug testing of Department of Transportation motor vehicle operators who transport dignitaries, operate shuttle buses, or drive mail vans that carry classified documents). *American Fed'n of Gov't Employees v. Thornburgh,* 798 F.Supp. 597, 599 (N.D.Cal.1991) (random drug testing of Immigration and Naturalization Service drivers of vehicles that carry passengers or security-sensitive materials); *American Fed'n of Gov't Employees v. Derwinski,* 777 F.Supp. 1493, 1500 (N.D.Cal.1991) (random drug testing of Veteran's Administration drivers of vehicles that carry passengers); *National Treasury Employees Union v. Hallett,* 776 F.Supp. 680, 687, 697 (E.D.N.Y.1991) (random drug testing of Customs Service drivers who deliver mail and passengers); *Burka v. New York City Transit Auth.,* 739 F.Supp. 814, 826 (S.D.N.Y.1990) (random drug testing of bus operators); *cf. Plane v. United States,* 796 F.Supp. 1070, 1075–78 (W.D.Mich. 1992) (random drug testing of heavy equipment operators); *Middlebrooks v. Wayne County,* 446 Mich. 151, 521 N.W.2d 774 (1994) (similar). *But see American Fed'n of Gov't Employees v. Sanders,* 926 F.2d 1215, 1991 WL 33473, at *1 (D.C.Cir.1991) (affirm-

ing lower court decision that permitted random drug testing of Department of Education drivers who transport passengers but vacating portion of decision permitting such testing of other drivers); *American Fed'n of Gov't Employees v. Sullivan*, 787 F.Supp. 255, 257 (D.D.C.1992) (striking down random drug testing of motor vehicle operators who do not carry passengers or have access to classified information); *National Treasury Employees Union v. Watkins*, 722 F.Supp. 766, 769 (D.D.C.1989) (preliminary injunction against random drug testing of Department of Energy motor vehicle operators who transport documents).

{12} There is also authority for suspicionless drug testing of vehicle mechanics, because errors in their work can cause the vehicles to operate dangerously. *See English v. Talladega County Bd. of Educ.*, 938 F.Supp. 775, 782 (N.D.Ala.1996) (random drug testing of mechanic's helper who inspected, repaired, and drove school buses), *Thornburgh*, 798 F.Supp. at 599; *Derwinski*, 777 F.Supp. at 1500; *cf. Bluestein v. Skinner*, 908 F.2d 451, 456 (9th Cir.1990) (random drug testing of aviation maintenance personnel). But the drug testing of Jaramillo was predicated solely on the requirement in Administrative Instructions Nos. 121 and 123 that employees be tested before being issued City operating permits. Jaramillo's driving, not his mechanical work on the vehicle, was the justification for the testing. We therefore need not consider any hazards arising from the mechanical work itself.

{13} Jaramillo distinguishes the above authority on two grounds. First, he contends that the City's program would have minimal impact on employee drug use. Second, he contends that regardless of the merits of such drug testing of drivers of heavy vehicles, he was not such a driver.

{14} We briefly address the first argument. Jaramillo contends that drug use will not be detected or deterred by testing employees when the employee has long advance notice of the test. He contends that as a matter of common sense, a drug-using employee would simply stop for a relatively brief period of time before the scheduled test and then resume drug use thereafter. *Compare Von Raab*, 489 U.S. at 676, 109 S.Ct. 1384 (union argued that employees can deceive the tests by abstaining for short period before the tests; Court says the argument "overstates the case") *with Chandler*, 117 S.Ct. at 1304 (expressing skepticism about effectiveness of test when candidates could escape detection by abstaining for sufficient time before test). On the other hand, the City points to testimony, by a fellow worker called as a witness by Jaramillo, that counters Jaramillo's "common sense" argument. The witness testified that he had halted his use of marijuana in order to pass the drug test and that he did not resume drug use thereafter. Also, the City contends that periodic testing (whenever the driver's license expires) will eliminate those hardcore drug users who find it impossible to stop using drugs even for a short time. Perhaps if periodic scheduled testing is combined with other testing, it may be an effective component of an anti-drug program. We do not resolve the issue, however, because we agree with Jaramillo's second challenge to the testing.

{15} The basis of the second challenge is that safety issues with respect to driving heavy vehicles are irrelevant to Jaramillo's case. At the time of the drug test he had not worked on heavy vehicles since he had left the Pino Yard nine months earlier. For nine months he had worked at the City maintenance yard, where the maintenance workers do not work on heavy vehicles. The City responds that even though Jaramillo had no responsibility with respect to heavy vehicles at the time of his drug test, he was classified as a Mechanic III and could be transferred at any time to work again on such vehicles at the Pino Yard. Indeed, the City asserts that Jaramillo's prior experience at the Pino Yard would make him a prime candidate for transfer.

{16} The City, however, failed to provide any evidence of the likelihood of such a transfer. Jaramillo had not been transferred

during any portion of the nine months that he had worked in the City maintenance yard. The City offered no evidence of any worker's having been transferred from the City maintenance yard to the Pino Yard during the time Jaramillo was employed by the City. At trial, more than five years after the firing, the only evidence of such transfers was that one had occurred about two months earlier. Moreover, given that the sole safety concern argued by the City was *driving* heavy vehicles (rather than just performing maintenance on them), it is not clear why a maintenance worker without a CDL could not turn over any driving duties to a co-worker until obtaining a CDL. We recognize that the need for administrative flexibility could justify drug testing some workers who are not always performing hazardous work. *Cf. Harmon v. Thornburgh,* 878 F.2d 484, 492 (D.C.Cir.1989) (upholding drug testing of all Justice Department personnel with top secret security clearances without showing extent of each employee's access to classified information). But in the circumstances here, the City had to make some showing of the need for drug testing every City mechanic who might be qualified to work at the Pino Yard. *Cf. American Fed'n of Gov't Employees v. Thornburgh,* 720 F.Supp. 154, 155 (D.Cal.1989) (reaffirming decision invalidating Federal Bureau of Prisons' plan for random drug testing of all employees because, in part, the plan was not "targeted at employees who perform specific job functions justifying the high level of government intrusion").

{17} In short, the theoretical possibility that Jaramillo would be transferred to the Pino Yard and be required to drive heavy vehicles is insufficient to sustain the drug test in this case. The United States Constitution requires more than mere speculation that at some time in the future the City would need Jaramillo to drive a heavy vehicle. The governmental interests that justify suspicionless drug testing must be tied to the "operational realities of the workplace." *Keaveney,* 937 F.Supp. at 985 (internal quotation marks deleted).

## CONCLUSION

{18} For the above reasons we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

{19} **IT IS SO ORDERED.**

DONNELLY and WECHSLER, JJ., concur.